COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Chaney and Raphael
Argued at Winchester, Virginia


AUNDREY HUBBARD

OPINION BY
v.      Record No. 0565-22-4      JUDGE CLIFFORD L. ATHEY, JR.
FEBRUARY 7, 2023

SCOTT H. JENKINS, IN HIS OFFICIAL CAPACITY AS
 SHERIFF OF CULPEPER COUNTY, VA


FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Richard B. Potter, Judge Designate

Seth Carroll (Commonwealth Law Group, on briefs), for appellant.

Rosalie P. Fessier (Timberlake Smith, Attorneys at Law, on brief),
for appellee.


Aundrey Hubbard ("Hubbard") appeals the decision of the Circuit Court of Culpeper

County ("circuit court") to grant the demurrer of Scott H. Jenkins, Sheriff of Culpeper County

("Sheriff Jenkins") and dismiss the case with prejudice. Hubbard contends that the circuit court

erred in holding that he was not an intended third-party beneficiary of a reimbursement contract

("the Contract") between the Piedmont Regional Jail Authority ("PRJA") and Sheriff Jenkins.

Hubbard also assigns error to the circuit court's holding that the Contract did not obligate Sheriff

Jenkins to pay for Hubbard's medical expenses. Finally, Hubbard contends that the circuit court

erred in holding that Hubbard's settlement agreement ("the Settlement") with PRJA, in a separate

action, released Hubbard's claims against Sheriff Jenkins. Since we find that Hubbard was not an

intended third-party beneficiary under the Contract, we affirm the decision of the circuit court

granting the demurrer.

# I. BACKGROUND

PRJA and Sheriff Jenkins entered the Contract on July 26, 2016, which provided for housing the inmates in Sheriff Jenkins' custody (the "Culpeper inmates") at Piedmont Regional Jail ("PRJ"). The Contract included "terms and conditions of the confinement of [the Culpeper] inmates." Paragraph 4 outlined who is financially responsible for the medical services of the Culpeper inmates. Paragraph 4 specified PRJA's financial responsibility for routine medical treatment for the Culpeper inmates and further delineated categories of medical care that would require Sheriff Jenkins' preapproval. Emergency medical treatment is addressed separately in paragraph 2(B) of the Contract. Paragraph 5 states that Sheriff Jenkins "will pay to PRJ[A] . . . [m]edical costs pursuant to paragraph 4 above," which lists these costs as "exceptions" that require "prior approval from the Sheriff."

On August 13, 2018, when he was incarcerated as an inmate at PRJ, Hubbard was assaulted by another inmate and sustained injuries. He filed a lawsuit in federal court in the United States District Court for the Eastern District of Virginia against PRJA and settled that litigation before trial for $340,000. Under the terms of the Settlement, Hubbard agreed "that he shall be solely responsible for any federal, state[,] or other taxes or other legal obligations that may be owed as a result of any such payment made by [PRJA] pursuant to the terms of this Agreement." Further, Hubbard released PRJA from any contract or tort claims that could arise from the litigation or surrounding facts.

Hubbard brought this action for a declaratory judgment that Sheriff Jenkins, not PRJA, is responsible under the Contract for the medical expenses incurred to treat Hubbard's injuries. Hubbard told us at oral argument that obtaining such a declaratory judgment would let him avoid the Commonwealth's lien for reimbursement of medical expenses, enabling him to enjoy the full benefit of his settlement with PRJA.

II. ANALYSIS

A. *Standard of Review*

In an appeal arising from the grant of a demurrer, "we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff." *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 72-73 (2019) (quoting *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 613 (2019) (citation omitted)).[1] "Statutory construction is a question of law which we review de novo." *Ferrara v. Commonwealth*, 299 Va. 438, 445 (2021) (quoting *Parker v. Warren*, 273 Va. 20, 23 (2007)), *cert. denied sub nom. Ferrara v. Virginia*, 142 S. Ct. 814 (2022).

B. *The circuit court did not err in sustaining the demurrer because Hubbard was not an intended third-party beneficiary under the Contract.*

On appeal, Hubbard argues that he is an intended third-party beneficiary of the Contract and that "the PRJA's and [Sheriff Jenkins]'s performance under the Contract renders direct benefit to Mr. Hubbard" as a Culpeper inmate. We disagree. Because Hubbard was not an intended beneficiary under the Contract, he has no standing to pursue his claim.

The third-party beneficiary doctrine allows a non-party to enforce an interest under a contract if the contract was clearly made for the benefit of that non-party, even if the party is not named in the contract. *See* Code § 55.1-119; *see also Ogunde v. Prison Health Servs., Inc.*, 274 Va. 55, 63 (2007) ("[U]nder certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." (quoting *Levine v. Selective Ins. Co. of Am.*, 250 Va.

---

[1] Even offering Hubbard a favorable interpretation of the facts, whether Hubbard is an intended third-party beneficiary of the financial arrangement is a legal conclusion, not a fact. We are not bound to accept Hubbard's legal argument for his claim of being an intended beneficiary. *See Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 102 (2001) ("A demurrer admits the truth of the facts contained in the pleading to which it is addressed, as well as any facts that may be reasonably and fairly implied and inferred . . . . A demurrer does not, however, admit the correctness of the pleader's conclusions of law.").

282, 285 (1995))); *Collins v. First Union Nat'l Bank*, 272 Va. 744, 751 (2006) ("We have consistently held that this third-party beneficiary doctrine is subject to the limitation that the third party must show that the contracting parties clearly and definitely intended that the contract confer a benefit upon him."); *Copenhaver v. Rogers*, 238 Va. 361, 367 (1989) ("The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain."); *cf. MNC Credit Corp. v. Sickels*, 255 Va. 314, 320 (1998) ("[A] person who benefits only incidentally from a contract between others cannot sue thereon.").

Here, the Contract between PRJA and Sheriff Jenkins included certain "terms and conditions of the confinement of inmates." Although paragraph 4 does explain that PRJA will provide certain forms of medical care to inmates, nothing in this paragraph describes a clear and defined financial benefit or cost burden being assigned to the Culpeper inmates; it only delineates the costs and responsibility for payment between the two contracting parties.

"[A] third person cannot maintain an action upon a contract merely because he would receive a benefit from its performance." *Envtl. Staffing Acquisition Corp. v. B&R Constr. Mgmt., Inc.*, 283 Va. 787, 795 (2012) (quoting *Valley Landscape Co. v. Rolland*, 218 Va. 257, 262 (1977)). Our Supreme Court has emphasized "the 'critical difference' between merely being a person or entity that will benefit from an agreement between other parties, and the very different situation in which a contract is entered into with the express purpose of conferring a benefit on a third party." *Id.* (quoting *Copenhaver*, 238 Va. at 368). The Court has decided numerous cases where a third party obviously benefitted from the contract but was not an express third-party beneficiary entitled to enforce its provisions. *E.g.*, *id.* (holding that a subcontractor was not an intended beneficiary of the contractor's agreement with the owner that required the contractor to obtain a payment bond); *Copenhaver*, 238 Va. at 368-71 (holding that

plaintiff grandchildren, whose inheritance was diminished through the alleged negligence of their grandparents' estate lawyer, were not express third-party beneficiaries of the legal-services contract between the lawyer and the grandparents); *Valley Landscape*, 218 Va. at 259-63 (holding that the contractor was not an intended third-party beneficiary of provisions in the contract between the architect and the owner).

We disagree with Hubbard that *Ogunde* is controlling. Ogunde filed a medical malpractice lawsuit against the medical-services provider hired by the Virginia Department of Corrections (VDOC) to provide medical care to inmates. 274 Va. at 59. The Supreme Court ruled that Ogunde qualified as an intended third-party beneficiary because the contract recited "that its *purpose* is to 'provide cost effective, quality inmate health care services for up to approximately 6,000 inmates.'" *Id.* at 63 (emphasis added). "The contract thus 'clearly and definitely' indicate[d] that [the contractor] and VDOC intended to provide a benefit to, among others, Ogunde." *Id.* (quoting *Pro. Realty Corp. v. Bender*, 216 Va. 737, 739 (1976)). The Contract here contains no similar recital that benefitting inmates was its express "purpose."

The absence of such a purpose recital is significant given the Sheriff's baseline "constitutional and statutory duty to provide medical care" to pretrial detainees and incarcerated inmates in his custody. *Patterson v. City of Danville*, ___ Va. ___, ___ (July 7, 2022); *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (describing the government's duty under the Due Process Clause "to provide medical care" to injured pretrial detainees); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding under the Eighth Amendment that the government must "provide medical care for those whom it is punishing by incarceration"). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

Code § 53.1-126 likewise prohibits a sheriff or jail superintendent from withholding "medical treatment . . . for any . . . serious medical needs" of a person in their custody. Given the Sheriff's preexisting legal obligation to provide medical care for inmates in his custody, the contract here did not create any new duty to provide such care. It was not an "expression[] of [the Sheriff's] intent to help" the inmates, *DeShaney*, 489 U.S. at 200; the duty of care was already there, and the Contract did not augment the care that Hubbard was to receive. That the Sheriff contracted with PRJA to house and care for inmates therefore does not suggest that the Contract was intended to confer a benefit on the inmates, rather than determine as between the Sheriff and PRJA how that care would be provided and who would pay for it.

It does not matter, as the dissent contends, whether the Contract is ambiguous in certain respects, such as whether the Sheriff or PRJA is responsible for paying the particular medical expenses in question. Hubbard has the threshold burden to show that the contracting parties "clearly and definitely" intended to confer a benefit upon detainees like Hubbard. *Ogunde*, 274 Va. at 63. Unable to point to a purpose recital like the one in *Ogunde*, Hubbard has not shown that the Sheriff and PRJA clearly and definitely intended the Contract to confer a benefit directly on the inmates themselves.

Thus, even taking the facts in the light most favorable to Hubbard, he failed to plead facts sufficient to show that he was an intended third-party beneficiary, rather than an incidental third-party beneficiary.[2] In order to bring a claim under the Contract, pursuant to Code § 55.1-119, Hubbard had to establish a clear and defined intent in the Contract to confer a benefit on the Culpeper inmates and show that one of the parties failed to uphold its side of the bargain. *See Copenhaver*, 238 Va. at 367. This is a demanding test that required Hubbard to show that he was

---

[2] The Court does not need to consider whether the trial court should have granted Hubbard leave to amend because Hubbard did not request that relief below. *See Legg v. Sch. Bd. of Wise Cnty.*, 157 Va. 295, 301 (1931).

- 6 -

not benefitting "only incidentally" from the Contract.  *Id.*  Since Hubbard did not meet his burden to show that he was an intended beneficiary of the financial arrangement under the Contract, the circuit court properly sustained the demurrer.

### III. CONCLUSION

Based on the foregoing analysis, we find that the circuit court properly sustained the demurrer.  Our finding that Hubbard was not an intended third-party beneficiary of the contractual provisions he seeks to enforce makes it unnecessary to reach Hubbard's second and third assignments of error, as judicial restraint obligates us to reach decisions on the best and narrowest grounds available.  *See Commonwealth v. White*, 293 Va. 411, 419 (2017).

*Affirmed.*

Raphael, J., concurring.

I am pleased to join the majority opinion. I write separately to explain why I disagree with the dissent. Even assuming that the dissent is correct that paragraph 2(B) of the Sheriff's contract with PRJ made Hubbard an intended third-party beneficiary of PRJ's promise to provide inmates with medical care, affirmance would still be required because that is not the promise that Hubbard seeks to enforce.

Unlike the plaintiff in *Ogunde v. Prison Health Services, Inc.*, 274 Va. 55, 63 (2007), Hubbard did not sue because he received inferior medical care. Hubbard seeks instead to enforce the cost-allocation provisions in paragraphs 4 and 5, which Hubbard contends require the Sheriff, not PRJ, to pay for Hubbard's medical treatment. There is nothing in the contract to suggest that the parties clearly and definitely intended detainees like Hubbard to have an enforceable interest in *that* promise.

This distinction raises an issue of first impression in Virginia: if a plaintiff is an intended third-party beneficiary of *one* provision of the contract, may he enforce *all* the other provisions? I conclude that the answer is no.

Unfortunately, we find no answer in Code § 55.1-119, which codifies the intended third-party-beneficiary doctrine for written contracts. The text of the statute is ambiguous, and the legislative history does not resolve that ambiguity. Code § 55.1-119 provides:

> An immediate estate or interest . . . may be taken by a person under an *instrument*, although he is not a party to such instrument; and if a covenant or *promise* is made for the benefit, in whole or in part, of a person with whom *it* is not made . . . , such person, whether named in the *instrument* or not, may maintain in his own name any action *thereon* that he might maintain as though *it* had been made with him only and the consideration had moved from him to the party making such covenant or promise.

(Emphases added). The key terms in the statute are "instrument," "promise," "thereon," and "it." The General Assembly appears to have used "it" to refer to the "promise" for the third party's

benefit, not to the "instrument" containing that promise. But the "thereon" is bedeviling. When the statute authorizes the third party to bring suit "thereon," does that mean suit on the "instrument" or suit on the "promise" that is made for the third party's benefit?

The dissent thinks that the first option—suit on the *instrument*—is compelled by the last-antecedent rule, citing *Alger v. Commonwealth*, 267 Va. 255, 260 (2004) ("[A] proviso usually is construed to apply to the provision or clause immediately preceding it." (quoting 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.33 (6th rev. ed. 2000))). "Of course, as with any canon of statutory interpretation, the rule of the last antecedent 'is not an absolute and can assuredly be overcome by other indicia of meaning.'" *Coffman v. Commonwealth*, 67 Va. App. 163, 170 (2017) (quoting *Lockhart v. United States*, 577 U.S. 347, 352 (2016)).

To my thinking, the last-antecedent rule does not ineluctably lead to a single answer here because its application is confounded "by the presence of the intervening clause." *In re E.B.*, 899 N.E.2d 218, 224 (Ill. 2008). In Code § 55.1-119, the intervening clause is "whether named in the instrument or not," which clearly modifies "such person." It is simply not clear whether *thereon* modifies *instrument* in the intervening clause, or *promise* in the preceding clause, or perhaps even both. So the last-antecedent rule "fail[s] to lead to an inescapable answer" and, therefore, does not save the statutory text from ambiguity. 899 N.E.2d at 224. Text is ambiguous when, as here, it "can be understood in more than one way or refers to two or more things simultaneously." *JSR Mech., Inc. v. Aireco Supply, Inc.*, 291 Va. 377, 383 (2016) (quoting *Boynton v. Kilgore*, 271 Va. 220, 227 n.8 (2006)).

We are instructed that, upon finding such ambiguity, "we must apply the interpretation that will carry out the legislative intent behind the statute." *Id.* at 384 (quoting *Kozmina v. Commonwealth*, 281 Va. 347, 349-50 (2011)). The legislative history, however, provides no answer either.

Code § 55.1-119 and "its predecessor statutes[] superseded the 'general rule at common law . . . that an action on a contract must be brought in the name of the party in whom the legal interest is vested." *Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Est. Co.*, 294 Va. 416, 424 n.6 (2017) (discussing Code § 55-22, the predecessor of Code § 55.1-119). As first enacted in 1849, the statute enabled a third-party beneficiary to bring suit only if the contract was "made for [his] *sole* benefit." Code of 1849, ch. 116, § 2 (emphasis added); *Newberry Land Co. v. Newberry*, 95 Va. 119, 121 (1897) (requiring that the third party be "plainly designated by the instrument as the beneficiary, and the covenant or promise [be] made for his sole benefit").

The Code of 1919 revised and amended the statute, relaxing those requirements. *See* Code of 1919, § 5143. The amendment permitted an action by an intended third-party beneficiary "whether named in the instrument or not." *Compare id. with* Code of 1887, § 2415. The amendment also deleted the "sole benefit" requirement.[3] But those changes, carried forth in the current version of the statute, do not answer whether a third party who is a clearly intended beneficiary of *one* provision may enforce *everything else* in the contract.

I conclude that requiring the claimant to show that he is an intended third-party beneficiary of the particular provision he seeks to enforce best advances the legislative purpose. At least two considerations support this conclusion.

First, courts in other jurisdictions have consistently held that the claimant must show that he is an intended third-party beneficiary of the specific contractual provision the claimant seeks to enforce. *See, e.g.*, *Murphy v. Allstate Ins. Co.*, 553 P.2d 584, 588 (Cal. 1976) ("A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He

---

[3] The Revisors' note said that "the section has been so changed as to be applicable where the covenant or promise is for the benefit, *in whole or in part*, of a person, thereby changing the law in this respect. No good reason was perceived for limiting the relief to a promise for the sole benefit of a person." Code of 1919, § 5143, at 2135 (Revisors' note); *see Horney v. Mason*, 184 Va. 253, 257-58 (1945) (discussing the 1919 amendment).

is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. As to any provision made not for his benefit but for the benefit of the contracting parties or for other third parties, he becomes an intermeddler." (citations omitted)); *MBIA Ins. Corp. v. Royal Indem. Co.*, 519 F. Supp. 2d 455, 464 (D. Del. 2007) ("A party can be a beneficiary of some promises in a contract and not of others."), *aff'd*, 321 F. App'x 146 (3d Cir. 2009); *Wilder v. Wright*, 278 So. 2d 1, 3 (Fla. 1973) (holding that the party's status as a named beneficiary in an insurance contract does not entitle it "to enforce any and every provision of law or of the insurance contract"); *Archer W. Contractors, Ltd. v. Est. of Pitts*, 735 S.E.2d 772, 778 (Ga. 2012) ("Consistent with Georgia law, courts in other jurisdictions have observed that '[s]tatus as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit.'" (quoting *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011))); *GE Cap. Info. Tech. Sol., Inc. v. Campbell Ads LLC*, No. 2:11-cv-082-PPS-APR, 2013 WL 587887, *6 (N.D. Ind. 2013) ("[A]n intended beneficiary to a contract [can only] seek to enforce the particular provisions or promises that are intended to benefit him or her. That beneficiary can't sue to enforce any other provision that's not."); *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 612 (S.D.N.Y. 2011) ("[T]he parties can obviously intend for a third party to benefit from certain promises in a contract and not others. . . . Applying these principles, New York courts have denied the right to compel arbitration to third parties that otherwise benefitted from a contract."), *aff'd*, 472 F. App'x 11 (2d Cir. 2012); *Nw. Airlines, Inc. v. Crosetti Bros., Inc.*, 483 P.2d 70, 72 (Or. 1971) ("[P]aintiff is not a third-party beneficiary of Crosetti's promise to indemnify. . . . A contract may consist of a series of promises. . . . Third parties may be beneficiaries of some of these promises and not of others.").

That consensus of legal authority reflects the sensible view that just because the parties wanted one provision of a contract to be enforceable by an intended third-party beneficiary does not mean they empowered the third party to sue on all the other provisions. Such other provisions might include indemnification clauses, *e.g.*, *Nw. Airlines*, 483 P.2d at 72 (refusing to permit intended third-party beneficiary to enforce the contract's indemnification clause); arbitration clauses, *e.g.*, *Republic of Iraq*, 769 F. Supp. 2d at 612 ("New York courts have denied the right to compel arbitration to third parties that otherwise benefitted from a contract."); and attorney-fee shifting provisions, *e.g.*, *Sessions Payroll Mgmt. Inc. v. Noble Constr. Co.*, 101 Cal. Rptr. 2d 127, 133 (Cal. Ct. App. 2000) (denying attorney fees to intended third-party beneficiary under contract's fee-shifting provision); *Wilder*, 278 So. 2d at 3 (same); *Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n*, 997 So. 2d 433, 435 (Fla. Dist. Ct. App. 2008) (same).

Second, this rule provides the best gap-filling or "'off the rack' default rule." Robert E. Scott, *A Relational Theory of Default Rules for Commercial Contracts*, 19 J. Legal Stud. 597, 599 (1990). As Justice Holmes explained at the beginning of the last century, "the common rules have been worked out by common sense," which he understood to mean the contractual rules that "the parties probably would have [worked out] if they had spoken about the matter." *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543 (1903) (Holmes, J.). Identifying the off-the-rack rule that most parties probably would have adopted had they negotiated it helps "expand contractors' choices by providing widely suitable preformulations, thus eliminating the cost (and the error) of negotiating every detail of the proposed agreement." Scott, *supra*, at 606.

This common-sense approach favors requiring the claimant to show that he is an intended third-party beneficiary of the specific contractual provision he seeks to enforce. Think of it this way: regardless of the off-the-rack default rule that the court adopts, the parties are free to

negotiate different terms. If they want, the parties may disclaim third-party-beneficiary rights altogether.[4] Now suppose that the default rule provides that an intended third-party beneficiary of one provision may enforce *all* of the contract's provisions. That default rule would make it more costly for the parties to negotiate different terms. They would have to identify each contractual provision that they do not intend the third party to enforce. They would have to decide, for example, if they really want the third party to claim indemnification, to recover its attorney fees under the contract's fee-shifting provisions, or to compel arbitration under an arbitration clause. To think through each provision and draft opt-out language would take time and money. The better off-the-rack rule, therefore, is that third-party-beneficiary rights are limited to those contractual provisions from which the court may determine that the parties "clearly and definitely intended it to confer a benefit upon" the third party. *Pro. Realty Corp. v. Bender*, 216 Va. 737, 739 (1976).

I find it difficult to conceive that the General Assembly would have chosen a default contractual rule in Code § 55.1-119 that would make Virginia an outlier jurisdiction on third-party-beneficiary claims and impose heavy transaction costs on parties who wish to negotiate different terms. Take this case: there is nothing in the contract between the Sheriff and PRJ to suggest that the parties thought they were conferring on Culpeper inmates a right to demand that the Sheriff, rather than PRJ, pay for the inmates' medical care, let alone a right to sue on that promise. The inmates' interest is in the receipt of appropriate medical care, not insisting on which governmental entity pays for it.

---

[4] *See, e.g.*, *Envtl. Staffing Acquisition Corp. v. B&R Constr. Mgmt., Inc.*, 283 Va. 787, 793-94 (2012) (enforcing disclaimer that only the signatories were intended beneficiaries); *Richmond Shopping Ctr., Inc. v. Wiley N. Jackson Co.*, 220 Va. 135, 142 (1979) (enforcing disclaimer that the parties did not intend to create any third-party beneficiaries).

If the contractual default rule were the one the dissent advocates, then to negotiate different terms, the Sheriff and PRJ would have had to decide for each paragraph whether they intended to confer enforceable rights on inmates. Common sense does not favor that approach.

Chaney, J., dissenting.

The appellant, Aundrey Hubbard (Hubbard), filed a complaint (Complaint) in the trial court seeking a declaratory judgment that a contract between Sheriff Scott H. Jenkins (Sheriff Jenkins) of Culpeper County and Piedmont Regional Jail Authority (PRJA) (Contract) requires Sheriff Jenkins to pay for emergency medical treatment Hubbard received as a result of severe injuries he sustained while incarcerated at PRJA. Sheriff Jenkins demurred to the Complaint on the grounds that (1) Hubbard is not an intended third-party beneficiary of the contract, (2) Hubbard's tort settlement agreement with PRJA releases Sheriff Jenkins from liability, and (3) the Contract payment and invoicing provisions are unfulfilled conditions-precedent to Sheriff Jenkins' liability. The trial court sustained the demurrer on the grounds asserted.

I disagree with the majority's and the concurrence's conclusion that Hubbard is not an intended third-party beneficiary of the Contract between Sheriff Jenkins and PRJA. On review of the trial court's decision to sustain a demurrer, viewing all factual allegations—as amplified by documents incorporated into the Complaint—in the light most favorable to Hubbard, and further resolving any material ambiguity in the Contract in Hubbard's favor, Hubbard is clearly and definitely an intended third-party beneficiary of Sheriff Jenkins' promise to pay the medical expenses of inmates transferred from Culpeper County Jail to PRJA. The majority grounds its conclusion that Hubbard is not an intended third-party beneficiary of the Contract on the absence of an explicit "purpose recital" comparable to the recital in the contract at issue in *Ogunde v. Prison Health Servs., Inc.*, 274 Va. 55 (2007). Although the Supreme Court relied on the "purpose recital" in the contract at issue in *Ogunde* to hold that the plaintiff in that case was an intended third-party beneficiary, *Ogunde* did not hold that an explicit purpose recital is the *only* way to prove that a party is clearly and definitely an intended third-party beneficiary of a contract.

Here, the Contract's express purpose is to provide an unnamed and transient class of inmates from Culpeper County Jail with the benefits of PRJA's custody and care, including the emergency medical treatment at issue, at Sheriff Jenkins' expense. Because the Contract's express purpose is to provide benefits to such inmates, Hubbard, as one such inmate, is an intended third-party beneficiary of the Contract under the Supreme Court's holding in *Ogunde*. In concluding that the purpose of the Contract is merely a "financial arrangement" between Sheriff Jenkins and PRJA, the majority and the concurrence disregard controlling Supreme Court precedent that requires this Court—on demurrer—to view the *factual* recitals of the purpose of the Contract attached to the Complaint in the light most favorable to Hubbard and to grant Hubbard all plausible inferences from those facts.

The majority's further assertion that Sheriff Jenkins' independent duty of care to Hubbard under the Eighth Amendment and the Due Process Clause "does not suggest that the Contract" was "an expression[] of [the Sheriff's] intent to help the inmates," fails on its own terms and is unsupported by the cited authority. The Contract—construed as a whole—plainly has the purpose that Sheriff Jenkins and PRJA combine to provide the benefits of custody and care to Hubbard. Sheriff Jenkins contributes the promise to *pay*, and PRJA contributes the promise to *provide the custody and care*. Contrary to the majority, the fact that Sheriff Jenkins was under a legal obligation to care for Hubbard makes Sheriff Jenkins' intent that the Contract benefit Hubbard more—not less—clear and definite.

The concurrence's argument that a party's status as an intended third-party beneficiary be decided separately for each contractual provision does not add any support to the majority's conclusion that Sheriff Jenkins' promise to pay for custody and care was not clearly and definitely intended to benefit inmates in the class that includes Hubbard. The controlling third-party beneficiary statute—Code § 55.1-119—refers to actions under *instruments*, not

- 16 -

provisions. The concurrence's reliance on a purported ambiguity in Code § 55.1-119 fails because the purported ambiguity *does not exist*.[5] The concurrence relies on the asserted ambiguity to justify importing laws from multiple foreign jurisdictions to distinguish between PRJA's promise to provide Hubbard with custody and care and Sheriff Jenkins' promise to pay for Hubbard's custody and care. However, none of the foreign authorities support excluding a contract promise intended to benefit the third-party beneficiary from third-party enforcement. Therefore, the foreign cases cited by the concurrence have no application to Hubbard's right to enforce Sheriff Jenkins' promise to pay for Hubbard's custody and care at PRJA. Moreover, the foreign cases relied on by the concurrence apply third-party beneficiary statutes that materially differ from Code § 55.1-119.

None of the remaining grounds for demurrer before the trial court provide grounds to support the trial court's judgment. Sheriff Jenkins' argument that the invoicing and payment provisions of the Contract are unfulfilled conditions-precedent to Sheriff Jenkins' liability is incorrect. The "Confidential Settlement Agreement, General Release and Non-Disclosure Agreement" that settled Hubbard's prior lawsuit against PRJA (Settlement) neither releases Sheriff Jenkins nor requires Hubbard to use settlement proceeds to pay for the emergency medical services at issue. Because the demurrer cannot be sustained on any ground that was before the trial court, I would reverse the trial court's judgment.

Accordingly, I respectfully dissent.

## I. STANDARD OF REVIEW

Because this case was decided on demurrer, the facts must be viewed "in accordance with well-established principles that a demurrer admits the truth of all material facts that are properly

---

[5] The concurrence's asserted ambiguity in Code § 55.1-119 presents an issue that was neither raised nor briefed by the parties.

pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred from alleged facts." *MNC Credit Corp. v. Sickels*, 255 Va. 314, 316 (1998) (quoting *Cox Cable Hampton Roads v. City of Norfolk*, 242 Va. 394, 397 (1991)). This Court also considers factual assertions in documents attached to and incorporated into the complaint—or incorporated in response to a motion craving oyer—as those documents may be used to amplify the facts alleged in a complaint when a court decides whether to sustain or overrule a demurrer. *See Hale v. Town of Warrenton*, 293 Va. 366, 366 (2017) (quoting *EMAC, L.L.C. v. County of Hanover*, 291 Va. 13, 21 (2016)).

This Court "review[s] issues of contract interpretation de novo." *Ehrhardt v. SustainedMED, LLC*, 300 Va. 334, 340 (2021) (quoting *City of Chesapeake v. Dominion SecurityPlus Self Storage, L.L.C.*, 291 Va. 327, 334 (2016)). When considering the meaning of any part of a contract, this Court construes the contract as a whole. *See Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179-80 (2016) (quoting *Doctors Co. v. Women's Healthcare Assocs.*, 285 Va. 566, 572-73 (2013)). Accordingly, in construing a contract, this Court strives not to place emphasis on isolated terms wrenched from the larger contractual context. *See Quadros & Assocs. v. City of Hampton*, 268 Va. 50, 54 (2004).

A judgment sustaining a demurrer to a contract claim must be reversed if the contract is ambiguous, and resolving the ambiguity is necessary to determine whether the demurrer was properly sustained. *See Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc.*, 200 Va. 593, 596 (1959) (reversing trial court judgment sustaining demurrer where contract was deemed materially ambiguous). As explained in *Greater Richmond Civic Recreation*:

> Ordinarily it is the duty of the court to construe a
> written contract when it is clear and unambiguous on its face, but
> when a contract is ambiguous it is necessary to resort to parol
> evidence to ascertain the exact intention of the parties.

- 18 -

*Id.* It follows that—when reviewing a demurrer—all contractual ambiguities are resolved in favor of the plaintiff. "No grounds other than those stated specifically in the demurrer shall be considered by the court." Code § 8.01-273.

## II. FACTUAL BACKGROUND

On May 12, 2018, Hubbard was arrested and placed in the custody of the Sheriff's Office of Culpeper County. Complaint, ¶ 8. Sheriff Jenkins—the Sheriff of Culpeper County when Hubbard was arrested—continues to be the Sheriff of Culpeper County. Complaint, ¶ 7. Sheriff Jenkins is authorized to enter into binding contractual agreements with other jail facilities pursuant to Code § 53.1-79.1. Complaint, ¶ 7. While Hubbard was awaiting trial, Sheriff Jenkins transferred Hubbard to PRJA in accordance with the Contract. Complaint, ¶¶ 9, 10.

The Contract recitals recognize the mutually accepted facts that constitute the basis and purpose of the Contract. Contract, p. 1. First, the Contract recognizes that Sheriff Jenkins is "charged with the custody and care of all inmates in his jurisdiction." *Id.* The Contract also recognizes that Sheriff Jenkins is authorized—pursuant to Code § 53.1-79.1—to enter into an agreement with PRJA to fulfill Sheriff Jenkins' duty of custody and care to inmates. *Id.* Pertinently, as part of PRJA's agreement to fulfill Sheriff Jenkins' duty of custody and care to Culpeper inmates, PRJA agreed to "provide emergency medical treatment." Contract, ¶ 2(B). The purpose of the Contract is to reduce to writing PRJA's agreement to fulfill—at Sheriff Jenkins' expense—Sheriff Jenkins' duty of custody and care to inmates originally incarcerated at Culpeper County Jail. Contract, p. 1.

Under the Contract, PRJA "agrees to confine up to 100 inmates . . . from Culpeper County, Virginia that the Sheriff desires to house at PRJ[A]." Contract, ¶ 1; Complaint, ¶ 10. PRJA agreed to "house, feed, and confine securely" all inmates transferred (Transfers). Complaint, ¶ 14; Contract, ¶ 2. Sheriff Jenkins agreed to pay a base rate of $32 per day per

- 19 -

inmate. Complaint, ¶ 13; Contract, ¶ 5(A). PRJA agreed that routine health checks and dental care, including tooth extractions, were included at no additional charge to Sheriff Jenkins. Complaint, ¶ 14; Contract, ¶ 4. Aside from the routine medical care included in the base rate, all other medical costs are paid by Sheriff Jenkins. Contract, ¶¶ 2(B), 4, 5(B), 5(C); Complaint, ¶ 15. PRJA is required to obtain pre-approval from Sheriff Jenkins only for the following medical care when that care would result in additional charges: non-emergency treatment, chronic care, care for preexisting conditions, care for elective medical procedures, outside psychiatric care, care for chronic illnesses, and prescription medications. Contract, ¶ 4. The Contract only conditions Sheriff Jenkins' responsibility for the cost of medical care when pre-approval for non-emergency medical care is expressly required. *Id.* Sheriff Jenkins is unconditionally responsible for the cost of emergency medical treatment. Contract, ¶¶ 2(B), 4, 5(B), 5(C).

Hubbard suffered severe injuries at the hands of other inmates while housed at PRJA. Complaint, ¶ 16. The seriousness of the injuries required Hubbard to be taken to the Virginia Commonwealth University (VCU) emergency room in Richmond, Virginia. Complaint, ¶ 17. Hubbard spent several days in the emergency room and required multiple surgeries before being discharged. Complaint, ¶ 18.

Hubbard's total medical expenses for the injuries he suffered at PRJA amount to $70,006.47. Complaint, ¶ 22. VCU sent demands to pay Hubbard's medical expenses to both Sheriff Jenkins and PRJA. Complaint, ¶ 20. Neither Sheriff Jenkins nor PRJA have paid VCU. *Id.* Because Sheriff Jenkins failed to pay those expenses, the Attorney General of Virginia asserted a lien against Hubbard for nearly $50,000 of VCU's charges for Hubbard's medical treatment. Complaint, ¶ 23.

III.  HUBBARD'S THIRD-PARTY BENEFICIARY STATUS

A.  <u>The Purpose of the Contract</u>

I agree with the majority that determining the purpose of the Contract is critical to determining whether Hubbard is an intended third-party beneficiary of the Contract.  I also agree with the majority that the Contract contains terms that define Sheriff Jenkins' financial responsibility for PRJA's care of Transfers from Culpeper County Jail.  However, I disagree with the majority's conclusion that those financial terms constitute *the purpose* of the Contract.  The financial terms of this Contract—while as necessary and indispensable as they would be in any contract where payment is exchanged for performance—do not negate the primary stated purpose of having PRJA fulfill Sheriff Jenkins' duty to provide *custody and care* to inmates of Culpeper County Jail at Sheriff Jenkins' expense.

> 1.  The purpose of the Contract is for PRJA to provide custody and care to the class of inmates including Hubbard at Sheriff Jenkins' expense.

Hubbard is an intended third-party beneficiary of the Contract because the Contract has the express purpose of providing for Hubbard's housing, security, and health care at Sheriff Jenkins' expense.  At the outset, the Contract recites that Sheriff Jenkins is "charged with the custody and care of all inmates in his jurisdiction."  Contract, p. 1.  The Contract then recites that its purpose is to reduce to writing the "terms and conditions of the confinement" of Transfers at PRJA.  *Id.*  The Contract assigns full financial responsibility to Sheriff Jenkins for PRJA's inmate custody and care services in the form of a base rate and additional charges.  *See* Contract, ¶¶ 2(B), 4, 5(B), 5(C); Complaint, ¶ 15.  The only exception to Sheriff Jenkins' financial responsibility is non-emergency medical care for which PRJA is required, but fails, to obtain pre-approval.  Contract, ¶ 4.  The inescapable conclusion from these contractual recitals is that the Contract's *purpose* is to ensure that Sheriff Jenkins' duty of custody and care to Transfers is satisfied by PRJA at Sheriff Jenkins' expense.  *See Bower v. McCormick*, 64 Va. 310, 327-28

- 21 -

(1873) (where the parties' agreement is based on factual recitals in *whereas* clauses, the parties are bound by those recitals and are estopped from denying them); *Vilseck v. Vilseck*, 45 Va. App. 581, 584 (2005) (contract recitals demonstrate the parties' intent); *Davis v. Davis*, 239 Va. 657, 660 (1990) (giving binding effect to the parties' intent expressed in a *whereas* clause of the contract).

Moreover, because these Contract recitals are in a document attached to the Complaint, this Court is bound—on demurrer—to view the factual allegations of the Complaint amplified by those recitals—and all inferences reasonably and fairly drawn from them—in Hubbard's favor. *See MNC Credit Corp.*, 255 Va. at 316 (demurrer admits the truth of all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred from alleged facts); *Hale*, 293 Va. at 366 (documents attached to the complaint may be used to amplify the facts alleged in a complaint when a court decides whether to sustain or overrule a demurrer). Sheriff Jenkins' contractual *delegation* to PRJA—at the sheriff's expense—of his duty of custody and care to Transfers does not relieve Sheriff Jenkins of his continuing responsibility.

The majority's re-characterization of the Contract's purpose to strictly limit any intended benefits to Sheriff Jenkins and PRJA fails in view of the Contract's plain terms. The majority asserts that the purpose of the Contract could be to "determine as between the Sheriff and PRJA how . . . care would be provided and who would pay for it." Focusing on specific Contract terms, such as paragraph 4, the majority concludes that the Contract "only delineates the costs and responsibility for payment between the two contracting parties." The majority concludes that this possible characterization of the Contract's purpose demonstrates that Hubbard has failed to show that the parties clearly and definitely intended the Contract to benefit Hubbard. However, construing the Contract as a whole, including the Contract recitals, the purpose of the

Contract is for PRJA to provide benefits to the class of inmates including Hubbard at Sheriff Jenkins' expense. Contrary to the majority, that purpose is not negated by specific contractual terms specifying the means the parties have chosen to cooperatively carry out that purpose by providing care and paying for it.

   2. Sheriff Jenkins' preexisting constitutional duty of care to inmates reinforces Sheriff Jenkins' intent that the Contract benefit members of the class of inmates that includes Hubbard.

Contrary to the majority, Sheriff Jenkins' constitutional and statutory duty of care to inmates reinforces the Contract's plain purpose to benefit Hubbard. In accord with the unambiguous contractual recitals, the Contract, as a whole, expresses an intent to provide custody and care to the class of inmates including Hubbard at Sheriff Jenkins' expense. That Sheriff Jenkins was motivated—however reluctantly—to enter into the Contract because of a preexisting duty to provide those benefits further demonstrates that the benefits were conferred intentionally, not incidentally.

The majority's reliance on *DeShaney v. Winnebago County Department of Social Services.*, 489 U.S. 189 (1989), for the proposition that Sheriff Jenkins lacked an intent to confer benefits on inmates is misplaced. In *DeShaney*, the Winnebago County Department of Social Services (DSS) initially obtained a custody order to protect a child from his father's abuse, but then released the child to the father's custody. 489 U.S. at 192. A DSS caseworker observed evidence of further abuse during monthly visits and knew of the child's need for emergency treatment services for that abuse, but did nothing. *Id*. at 192-93. Ultimately the child was so severely beaten by his father that he sustained permanent and disabling brain damage. *Id*. at 193. At issue in *DeShaney* was the existence of a *constitutional* basis for the mother's subsequent lawsuit against DSS under 42 U.S.C. § 1983. *Id*. The Supreme Court rejected—as a *constitutional basis* for the mother's 42 U.S.C § 1983 action—DSS's obligation to help the child

arising from DSS's alleged knowledge of the child's predicament or DSS's alleged expressions of intent to help the child.  *Id*. at 201.  The Court explained that although the Eighth Amendment—made applicable to the states through the Fourteenth Amendment's Due Process Clause—requires states to provide care to inmates, that obligation arises from the state's affirmative act of restraining inmates.  *Id*. at 198-99.  The duty to care for inmates does not *arise* from "the State's knowledge of the individual's predicament or from its expressions of intent to help him."  *Id*. at 200.

*DeShaney* neither holds nor asserts that those under a legal obligation to provide benefits to inmates—such as Sheriff Jenkins—lack an intent to help the inmate-recipients of those benefits.  *DeShaney* also does not hold or assert that parties' *contractual* expressions of an intent to confer benefits on inmates are negated by a preexisting duty to confer those benefits.  Even if Sheriff Jenkins' Eighth Amendment and Due Process Clause duty to care for inmates does not *arise* from Sheriff Jenkins' "expressions of intent to help inmates," Sheriff Jenkins' intent to confer benefits on the class of inmates including Hubbard is demonstrated by Sheriff Jenkins' contracting with PRJA to provide those benefits.  Because *DeShaney* provides no support to the majority's assertion that Sheriff Jenkins lacked the intent to provide benefits to inmates, the majority's contention that *DeShaney* supports requiring an express contractual recital of purpose to overcome that asserted lack of intent is incorrect.  Moreover, as previously explained, the Contract's "whereas clause" recitals provide an explicit recital of the Contract's purpose for PRJA to provide custody and care for inmates at Sheriff Jenkins' expense.  *See* Contract, p. 1.

The majority's further assertion that Sheriff Jenkins' preexisting duty to provide care to Hubbard proves the Contract "did not create any new duty" to provide benefits to the class of inmates including Hubbard disregards the new contractual duties of the parties to the Contract and lacks any citation to supporting authority.  Sheriff Jenkins entered into the Contract with

- 24 -

PRJA in order to exchange his promise to pay for the custody and care of the class of inmates including Hubbard for PRJA's promise to provide that custody and care. Thus, as a direct intended result of Sheriff Jenkins and PRJA entering into the Contract, Sheriff Jenkins assumed a *new duty* to pay, and, in exchange, PRJA assumed a *new duty* to provide custody and care to the class of inmates that includes Hubbard.

### B. Inmate Transfers Are Intended Third-Party Beneficiaries

1. Under *Ogunde*, transient members of a class of inmates intended to benefit from a contract are intended third-party beneficiaries of the contract.

Because the purpose of the Contract is to fulfill Sheriff Jenkins' duty of custody and care to inmate Transfers at Sheriff Jenkins' expense, those Transfers are intended third-party beneficiaries of the Contract. While the Contract does not expressly name any Transfers, Hubbard is a member of the transient class of the *up to 100* Transfers subject to the Contract. Thus, Hubbard is an intended third-party beneficiary of the Contract under controlling Supreme Court precedent. *See Ogunde*, 274 Va. at 63-64 (holding that where the purpose of the contract was to provide health care for *up to 6000* inmates at correctional facilities, each such inmate is an intended third-party beneficiary). As in *Ogunde*, the purpose of this Contract is to provide for the custody and care of up to 100 Transfers by PRJA at Sheriff Jenkins' expense. *See id.*

The majority's attempt to distinguish *Ogunde* fails because the Contract's financial terms do not *negate* the Contract's purpose of ensuring that PRJA fulfills Sheriff Jenkins' duty of custody and care to Transfers at Sheriff Jenkins' expense. Financial terms are a common attribute of agreements in which an entity—having no preexisting obligation—provides benefits to another. Nothing in the record supports an inference that PRJA was under any independent or preexisting obligation to provide for the custody and care of Transfers. Moreover, the Contract's financial terms—that the majority relies on—constitute an additional benefit to Hubbard. Those terms impose full financial responsibility for Hubbard's custody on Sheriff Jenkins. Neither the

Contract nor the record supports segregating the Contract's custody and care benefits from its financial benefits to determine whether Hubbard is the intended third-party beneficiary of those benefits.

2. Statutes and caselaw support Hubbard's intended third-party beneficiary status.

Although the majority cites cases that describe *incidental* third-party contract beneficiaries—which are easily distinguishable—the other authorities cited by the majority support Hubbard's *intended* third-party beneficiary status.

a. *Code § 55.1-119 supports Hubbard's intended third-party beneficiary status.*

Code § 55.1-119—from a section of the Code governing the "Creation and Transfer of Estates"—provides that:

> An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he is not a party to such instrument; and *if a covenant or promise is made for the benefit, in whole or in part, of a person with whom it is not made*, or with whom it is made jointly with others, *such person, whether named in the instrument or not, may maintain in his own name any action thereon that he might maintain as though it had been made with him only and the consideration had moved from him to the party making such covenant or promise*. In such action, the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but also against such beneficiary.

(Emphases added). Because the Contract has the *purpose* of providing Transfers, including Hubbard, with custody and care at Sheriff Jenkins' expense, its covenants *are* sufficiently "for the benefit" of Hubbard to supply the basis for Hubbard's standing as an intended third-party beneficiary under Code § 55.1-119.

b. *Hubbard is not a mere incidental third-party beneficiary of the Contract.*

*Copenhaver v. Rogers*, 238 Va. 361 (1989)—cited by the majority to support its contention that the purpose of the Contract is to specify a "financial arrangement" between Sheriff Jenkins and

PRJA—supports Hubbard's claim that he is an *intended* third-party beneficiary. In *Copenhaver*, grandchildren-beneficiaries (the Copenhavers) of a will sued for damages relating to an oral estate-planning contract between testators Wythe M. Hull and Lucile S. Hull (the Hulls) and attorney Frank W. Rogers (Rogers). 238 Va. at 363. The purpose of the legal services contract at issue was to "effectuate an estate plan" for the Hulls. *Id.* "More specifically, Rogers was retained to prepare and draft wills for the Hulls, evaluate the Hulls' assets, and take steps to minimize any 'transfer taxes.'" *Id.* The Copenhavers alleged that Rogers' negligent performance of the estate-planning contract resulted in damages consisting of a combination of unnecessary taxes and lost property interests. *Id.* The trial court sustained Rogers' demurrer and the Supreme Court affirmed based on the Copenhavers' failure to allege that they were "beneficiaries of the *principal contract*." *Id.* at 367. The Copenhavers alleged only that they were intended third-party beneficiaries of the Hulls' *estate*. *Id.* at 368. The Supreme Court held that the Copenhavers, thus, were mere *incidental beneficiaries* of the estate-planning contract because the intent of the estate-planning contract was to minimize tax payments to the government and prepare estate-related forms, not to provide particular benefits to the estate's beneficiaries. *Id.* at 368-69. The Supreme Court explained that a different estate-planning legal services contract that provided for taking steps necessary to ensure that each Copenhaver grandchild received a particular bequest would support intended third-party beneficiary status for the Copenhaver grandchildren. *Id.* at 369.

In this case—unlike *Copenhaver*—Hubbard *does* allege that he is an intended third-party beneficiary of the Contract. In addition—unlike *Copenhaver*—the Contract is in writing and the Contract's intended purpose is for PRJA to satisfy Sheriff Jenkins' duty of custody and care to Transfers—including Hubbard—at Sheriff Jenkins' expense. Although the Contract contains payment terms, and although any payment terms may be fairly described as part of a "financial

- 27 -

arrangement," there is no support in the Contract for the majority's contention that the *purpose* of the Contract is a mere financial arrangement.

Moreover, the contrasting examples of intended and incidental third-party beneficiaries provided in *Copenhaver* show that Hubbard is an intended third-party beneficiary. The distinction between intended and incidental third-party beneficiaries illustrated in *Copenhaver* (the *Copenhaver* distinction) is based on whether the contract at issue can be *fully performed* without necessarily conferring a benefit on the third-party seeking to assert intended third-party beneficiary status. In *Copenhaver*, the Hulls' contract with estate-attorney Rogers could be *fully performed* without conferring benefits on any of the Hulls' estate beneficiaries, as long as estate taxes were minimized and compliant estate forms were prepared. The Supreme Court explained that a different estate services contract—intended to ensure that specific bequests were made to each of the Copenhaver grandchildren—could *not* be fully performed without conferring a benefit on the Copenhaver grandchildren. In accordance with the *Copenhaver* distinction, Hubbard *is* an intended third-party beneficiary of the Contract because the Contract *cannot* be fully performed without PRJA satisfying Sheriff Jenkins' duty of custody and care to Transfers at Sheriff Jenkins' expense.

### c. *Other authorities relied on by the majority are distinguishable.*

*Collins v. First Union National Bank*, 272 Va. 744 (2006)—a case cited by the majority for the proposition that third-party intended beneficiaries must establish a clear and definite intent to confer a benefit on them—is easily distinguishable. In *Collins*, investors, whose funds were held by First Union National Bank (Bank) in "FBO" (for the benefit of) accounts set up for the Bank's customer InterBank, were held to not be intended third-party beneficiaries of the Bank's contract with InterBank. 272 Va. at 751. Although the Bank *named* InterBank's accounts "FBO," followed by the name of an InterBank investor, no evidence supported finding that either the Bank or InterBank intended to benefit any investor. *Id.* The evidence showed that the Bank *rejected* a

proposal to set up escrow accounts for the investors that would have imposed on the Bank duties to third parties. *Id.* The evidence also showed that InterBank's intent was to defraud the investors. *Id.* At best, *Collins* holds that the mere use of the term "FBO" in the name of accounts set up under a banking contract—absent other supporting evidence—cannot supply intended third-party beneficiary standing to the individuals whose names appear after the term "FBO." Unlike the contract between the Bank and InterBank in *Collins*, the Contract here has the sole purpose of providing benefits of custody and care to Transfers, including Hubbard, at Sheriff Jenkins' expense.

*MNC Credit Corp.*, 255 Va. 314—another case cited by the majority that rejects a claim of intended third-party beneficiary status—also lends no support to the majority's denial of intended third-party beneficiary status to Hubbard. In *MNC Credit Corp.*, the trial court sustained a demurrer on the ground that MNC Credit Corp. (MNC) failed to allege sufficient facts to support its claim that it was the intended third-party beneficiary of the contract. *See* 255 Va. at 319-20. Citing *Copenhaver*, the Supreme Court affirmed, explaining that MNC's allegation that the defendants knew that MNC *might* be the beneficiary of the contract was insufficient to make MNC an intended third-party beneficiary. *Id.* at 321. *MNC Credit Corp.* is plainly distinguishable from this case because Hubbard has alleged that the Contract is intended—not "might be intended"—to directly benefit him by having PRJA satisfy Sheriff Jenkins' duty of custody and care to Transfers at Sheriff Jenkins' expense. Moreover, the Contract recitals—which this Court is bound to accept as an amplification of Hubbard's allegations on demurrer—confirm that the purpose of the Contract is to directly benefit Culpeper inmates, including Hubbard.

IV. SHERIFF JENKINS' FINANCIAL RESPONSIBILITY FOR CUSTODY AND CARE COSTS

Since Hubbard is an intended third-party beneficiary of the Contract, Hubbard has standing to require Sheriff Jenkins to fulfill his promise to provide any benefits due under the Contract, including the financial benefit to Hubbard of Sheriff Jenkins' promise to be financially

- 29 -

responsible for the emergency medical treatment services at issue. The Contract's financial

terms show that the intent of PRJA and Sheriff Jenkins was that Sheriff Jenkins would bear *full*

financial responsibility for the custody and care of Transfers at PRJA. First, the Contract

requires that Sheriff Jenkins pay a flat $32 per day, per Transfer. Contract, ¶ 5(A). While the

Contract does not directly specify which services are included in the per diem rate, that can be

determined by considering which PRJA services do or do not result in *additional charges*.

Paragraph 5 provides that additional charges include:

> Medical costs pursuant to paragraph 4[; and]
>
> Any expense incurred by PRJ[A] for the care and/or treatment of
> an inmate confined for Culpeper County, Virginia at PRJ[A] other
> than for the housing, feeding and securely confining such inmate.

Contract, ¶¶ 5(B), 5(C). Paragraph 4 provides that "PRJ[A] will provide routine medical/sick

calls and dental care to include tooth extractions . . . without additional charge to [Sheriff

Jenkins]," thus specifying that those particular medical costs are bundled into the per diem rate.

The cost of all other medical treatment provided to Transfers at PRJA is Sheriff Jenkins'

responsibility and is not included in the per diem rate. Contract, ¶ 5.

The "treatment" provided to Transfers while at PRJA includes the emergency medical

services provided to Hubbard. *See* Contract, ¶ 2(B). Contract ¶ 2(B) states that "PRJ[A] will":

> Provide emergency medical treatment to any inmate held by
> PRJ[A] for Culpeper County, Virginia when time or other
> circumstances does not allow the Sheriff to provide the treatment
> of the inmate, as determined solely by PRJ[A] [see Contract, ¶ 4].

Viewing the facts in the light most favorable to Hubbard, the injuries Hubbard sustained at PRJA

required emergency medical treatment for which "time or other circumstances" did not allow

Sheriff Jenkins to provide the treatment.

Although paragraph 4 also provides penalties that relieve Sheriff Jenkins of his

responsibility for some non-emergency medical costs, those exceptions should be construed to

merely reflect the parties' intent that Sheriff Jenkins retain some control over the provision of some non-emergency medical services to Transfers. The parties reasonably intended that the financial penalty to PRJA for failing to obtain Sheriff Jenkins' pre-approval for non-emergency services would ensure that PRJA *would* obtain pre-approval, or permit Sheriff Jenkins to exercise his option to independently arrange for those services at his own expense. *See* Contract, ¶ 4 (Sheriff Jenkins may have the right to—*solely at his own expense*—transport Transfers to other facilities for medical care.). Moreover, to avoid the inference that Sheriff Jenkins can satisfy his duty of care to inmates by *withholding* necessary medical treatment from inmates, this provision must also be understood to require that any necessary medical treatment proposed by PRJA—but disapproved by Sheriff Jenkins—*will* be independently provided by Sheriff Jenkins at his sole expense. Thus, I disagree with the majority's apparent contention that this paragraph 4 penalty provision shows the intent of PRJA to assume responsibility for any share of the medical expenses of Transfers. Notwithstanding the penalty to PRJA for failing to seek pre-approval for some medical expenses, the Contract plainly intends that Sheriff Jenkins is responsible for all medical costs—either as bundled in the per diem rate or as separately assessed.

## V.  THE CONCURRENCE FAILS TO SUPPORT THE JUDGMENT

### A.  Code § 55.1-119 Is Not Ambiguous

Dissatisfied with Hubbard's statutory right to enforce Sheriff Jenkins' promise to pay for his emergency medical treatment, the concurrence asserts that Code § 55.1-119 is *ambiguous* and that this ambiguity can be resolved only by importing a different third-party beneficiary law from multiple foreign jurisdictions. The concurrence urges incorporating these foreign laws into Code § 55.1-119 as a way to reduce contract transaction costs with "gap filling" and "off the rack" contract default rules. But the asserted ambiguity of Code § 55.1-119 *does not exist*, and I reject the attempt to supplement the statute with extraneous principles not authorized by the Virginia

General Assembly.  *See Virginia Dep't of Health v. Kepa, Inc.*, 289 Va. 131, 140 (2015) ("The primary objective in statutory construction is to determine and give effect to the intent of the legislature as expressed in the language of the statute." (quoting *Appalachian Power Co. v. State Corp. Comm'n*, 284 Va. 695, 706 (2012))).  Code § 55.1-119 provides:

> An immediate estate or interest . . . may be taken by a person under an *instrument*, although he is not a party to such instrument; and if a covenant or promise is made for the benefit, in whole or in part, of a person with whom *it* is not made . . . , such person, whether named in the *instrument* or not, may maintain in his own name any action *thereon* that he might maintain as though *it* had been made with him only and the consideration had moved from him to the party making such covenant or promise.

(Emphases added).  The concurrence suggests that the phrase "action thereon" could mean either a "suit on the instrument" or a "suit on the promise."  On the contrary, in the statutory phrase "such person, whether named in *the instrument* or not, may maintain in his own name any action *thereon*," the word *thereon* has clear antecedent basis in the first preceding noun: *the instrument*. *See Alger v. Commonwealth*, 267 Va. 255, 259-60 (2004) (in accordance with the well-established *last antecedent doctrine*, referential words, where no contrary intention appears, refer *solely* to the last antecedent (citing 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.33 (6th rev. ed. 2000))).

Additionally, the statute's title provides an important clue to determining whether the statutory phrase "action thereon" means a suit on the instrument or a suit on the promise.  Code § 55.1-119 is entitled "§ 55.1-119. When person not a party, etc., *may take or sue under instrument*."  (Emphasis added).  Although the title of Code § 55.1-119 does not have the force of the statutory language itself, it provides context that can be used to guide the statute's interpretation.  *See Cox v. Commonwealth*, 73 Va. App. 339, 345 n.2 (2021) (using statute's title to determine the context for construing the statute).  Read in context, there can be no doubt that the "action thereon" is an action under the *instrument*.  If this Court adopts the concurrence's

- 32 -

rewrite of "action thereon" to "action under a promise that is made for the third party's benefit," the statute—despite having "take or sue under instrument" in its title—would absurdly contain no reference to suing under an instrument. "Under Virginia law, conflicting interpretations reveal an ambiguity only where they are reasonable." *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 29 (2019).

Even if the concurrence is correct that rules of statutory construction in the abstract do not bar associating "thereon" with "promise" in Code § 55.1-119, the qualifying statutory context "*maintain an action* thereon" renders the concurrence's suggestion highly implausible. The concurrence contends that other rules of statutory construction permit extending the referent of "thereon" to words prior to "instrument" because the immediately preceding candidate referent "instrument" occurs in a preceding clause set off by commas. The concurrence concludes from this that the collection of candidate antecedent referents of "thereon" in Code § 55.1-119 includes at least "promise" and "instrument," thus rendering Code § 55.1-119 ambiguous. By further construing "promise" or "covenant" to refer to a particular provision in a contract, the concurrence then purports to resolve the ambiguity by asserting, for a variety of policy reasons, that Code § 55.1-119 only authorizes third parties to enforce provisions, not contracts.

The concurrence's argument fails because the word "thereon" in Code § 55.1-119 is immediately preceded, qualified, and bound to the term "maintain an action." Thus, the statute is only ambiguous if "maintain an action thereon" is reasonably likely to mean either "maintain an action on an instrument" or "maintain an action on a provision of an instrument." Notably, the concurrence supplies no support for its contention that Code § 55.1-119 authorizes a novel cause of action on isolated individual contract provisions. Moreover, Code § 55.1-119, properly read

in its entirety, *excludes* the concurrence's suggestion that "action on a provision of an instrument" is intended. Code § 55.1-119 further provides:

> In *such action*, the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but also against such beneficiary.

(Emphasis added). In order for a promisor to "make all defenses" available against either the beneficiary or the promisee, the promisor must be able to assert claims arising from the entire instrument, not just the particular provision that the beneficiary seeks to enforce in isolation. As such claims can only be asserted in an action on the entire instrument, "such action" must refer to an action on the entire instrument, not an action on an isolated provision of the instrument. As "such action" unambiguously refers to "action thereon," the concurrence's claim that Code § 55.1-119 is ambiguous fails.

The concurrence's proposal—contrary to Code § 55.1-119—to evaluate the third-party beneficiary status of every provision of a contract in isolation is especially erroneous when multiple provisions of a contract provide intended benefits to a third party. As previously explained, the Contract includes both (1) PRJA's promise to provide custody and care to a class of Culpeper inmates, and (2) Sheriff Jenkins' promise to pay for that custody and care. Viewed in isolation, Sheriff Jenkins' obligation to pay PRJA may appear to be a mere "financial arrangement" between PRJA and Sheriff Jenkins without regard to third parties. However, properly viewed in the context of the Contract as a whole, that payment obligation implements Sheriff Jenkins' intent to benefit the class of inmates including Hubbard.

B. The Foreign Cases Cited Do Not Apply to Sheriff Jenkins' Promise to Pay

The limitations on third-party beneficiary actions stated in the foreign cases cited by the concurrence would not authorize disregarding Sheriff Jenkins' promise to pay for Hubbard's emergency medical treatment. Sheriff Jenkins entered into the Contract for the purpose of using

his promise to pay for Hubbard's custody and care as consideration for PRJA's promise to provide that custody and care to Hubbard. No case cited by the concurrence would prevent an intended third-party beneficiary—such as Hubbard—from compelling the performance of a Contract provision intended to benefit that very third-party.

For example, the concurrence cites *Murphy v. Allstate Ins. Co.*, 553 P.2d 584, 588 (Cal. 1976), for the principle that "[a] third party should not be permitted to enforce covenants made not for his benefit, but rather for others." In *Murphy*, the class of intended third-party beneficiaries included persons injured by a party to an insurance contract. *Id*. The provision intended to benefit a third-party related to the insurance company's obligation to pay claims of third-parties injured by the insured. *Id*. The insured's contract with the insurance company also included a provision imposing on the insurance company the duty to settle. *Id*. at 586-87. The court rejected the injured third-party claimant's bid to enforce the duty-to-settle provision. The court explained that the duty-to-settle provision was intended to benefit the insured, since the insurance company's failure to settle risked exposing the insured to a larger judgment at trial. *Id*. Although a duty-to-settle might benefit a third-party claimant under some circumstances, that benefit could conflict with the intended benefit to the insured since only the insured is interested in keeping the settlement within policy limits. *Id*. In this case, Sheriff Jenkins' obligation to pay Hubbard's emergency medical expenses is intended to benefit Hubbard. Sheriff Jenkins made that promise to ensure that Hubbard would receive custody and care from PRJA. In *Murphy*, the provision stating the insurance company's duty-to-settle bears no relationship to the provision requiring the insurance company to pay benefits to third-parties injured by the insured party.

Significantly, the concurrence omits the controlling California statute, California Civil Code § 1559, entitled "Enforcement by third party beneficiary," which provides:

> WHEN CONTRACT FOR BENEFIT OF THIRD PARTY MAY
> BE ENFORCED. A contract, made *expressly* for the benefit of a

- 35 -

third person, may be enforced by him at any time before the parties thereto rescind it.

(Emphasis added). In contrast, under Virginia law, Code § 55.1-119 only requires that the instrument include a promise that is made for the benefit of a third party, and that determination requires an important analytical step omitted by both the majority and the concurrence: construing the Contract *as a whole* to determine whether Sheriff Jenkins' promise to pay for Hubbard's emergency medical treatment was intended to benefit Hubbard. *See Pro. Realty Corp. v. Bender*, 216 Va. 737, 739 (1976) (third-party beneficiary is entitled to enforce a contract upon showing that the contract clearly and definitely intended to confer the benefit); *Babcock & Wilcox*, 292 Va. at 179-80 (when considering the meaning of any part of a contract, the court construes the contract as a whole); *Quadros & Assocs.*, 268 Va. at 54 (in construing a contract, the court strives not to place emphasis on isolated terms wrenched from the larger contractual context).

The concurrence cites additional foreign cases that apply its preferred limitation to actions by third-party beneficiaries, but the rule applied in those cases would not bar Hubbard from enforcing Sheriff Jenkins' promise to pay for his emergency medical services. In all of the foreign cases cited by the concurrence, the third-party beneficiary either (1) attempted to enforce a provision that was expressly excluded from third-party enforcement, or (2) attempted to enforce a provision intended to benefit someone else. But the Contract (i) has no express prohibition on enforcement by third parties pursuant to Code § 55.1-119, and (ii) identifies no other party that Sheriff Jenkins' promise to pay is intended to benefit. In *Archer W. Contractors, Ltd. v. Estate of Pitts*, 735 S.E.2d 772 (Ga. 2012)—cited by the concurrence—the court concluded that contractual language indicating that the injured party was an intended "participant" beneficiary did not necessarily show that other provisions intended to benefit individuals other than "participants" were also intended to benefit the injured party. *See* 735

S.E.2d at 778-80. In *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375 (S.D.N.Y. 2011)—also cited by the concurrence—an express limiting contract clause excluded third-party enforcement of the provision at issue. *See* 778 F. Supp. 2d at 414-15. The concurrence fails to point to any language in the Contract that supports the contention that the Contract expressly foreclosed third-party enforcement of Sheriff Jenkins' promise or that some party other than Hubbard is the clearly intended beneficiary of that promise. In view of the foregoing, the concurrence compounds the majority's disregard of the language of the Contract with the concurrence's disregard of the language of Code § 55.1-119.

## VI. THE REMAINING GROUNDS FOR DEMURRER FAIL

Having determined that (1) Hubbard is an intended third-party beneficiary of the Contract and that (2) the Contract includes the benefit to Hubbard of Sheriff Jenkins' promise to pay for Hubbard's emergency medical services, it is necessary to address the remaining grounds for demurrer that were before the trial court. *See* Code § 8.01-273(A) ("No grounds other than those stated specifically in the demurrer shall be considered by the court."). Those other grounds—not addressed by the majority or the concurrence—are that (1) the invoicing procedures are unfulfilled conditions-precedent to Sheriff Jenkins' liability for the cost of Hubbard's emergency medical services, and (2) the Settlement releases Sheriff Jenkins and requires Hubbard to pay the cost of his emergency medical services from settlement proceeds. As explained below, Sheriff Jenkins' financial responsibility for Hubbard's medical services is not conditioned on the Contract's invoicing provision. Also, the Settlement neither releases Sheriff Jenkins nor requires that Hubbard pay the cost of his emergency medical services from Settlement proceeds.

### A. The Invoicing and Payment Terms Are Not Conditions-Precedent

The billing and payment procedures stated in the Contract are not conditions-precedent to Sheriff Jenkins' liability for Hubbard's medical expenses. Thus, Sheriff Jenkins' reliance on any

asserted non-compliance with those procedures to disclaim any liability for Hubbard's medical services fails.

As explained above, the Contract makes Sheriff Jenkins responsible for all the costs and expenses of supplying medical services to Transfers, either as included in the per diem rate or as separately assessed. Sheriff Jenkins' specific payment obligations are specified in paragraphs 5(A) (per diem), 5(B) (medical costs, referencing paragraph 4), and 5(C) (PRJA expenses incurred for the care or treatment of Transfers). *See* Contract, ¶¶ 4, 5(A), -(B), -(C).

Sheriff Jenkins asserts that the Contract *conditions* his liability for medical expenses on both (1) PRJA incurring an expense, and (2) PRJA presenting an invoice to Sheriff Jenkins. Thus, according to Sheriff Jenkins, he has no contractual liability for Hubbard's emergency services and his demurrer should be sustained because Hubbard failed to allege that (1) PRJA paid for Hubbard's emergency medical services and that (2) PRJA invoiced Sheriff Jenkins for that expense. Yet, Hubbard's Complaint expressly alleges that VCU, the emergency medical service provider, has *billed both PRJA and Sheriff Jenkins*. *See* Complaint, ¶ 20. Nothing in the Contract supports interpreting "any expense incurred by PRJ[A]" to require that expenses are only *incurred* by PRJA when PRJA has *paid* the expense. Indeed, the Supreme Court has held that an expense is *incurred* when one is legally obligated to pay it. *See Virginia Farm Bureau Mut. Ins. Co. v. Hodges*, 238 Va. 692, 696 (1989) ("An expense can only be 'incurred' when one has paid it or become legally obligated to pay it."). Moreover, by requiring PRJA to pay an expense as a *condition-precedent* to Sheriff Jenkins' liability, Sheriff Jenkins' contract construction implausibly implies that PRJA has agreed—on pain of forfeiture—to make *advance payments* of Sheriff Jenkins' liabilities. In any event, the absence of any conditional language in the Contract expressing the specific intent to cause a forfeiture forecloses adopting this unsupported construction of the Contract's payment terms. *See Hunter v. Hunter as Tr. of Third*

*Amended & Restated Theresa E. Hunter Revocable Living Tr.*, 298 Va. 414, 424 (2020) (reaffirming "the ancient maxim that 'equity abhors forfeitures'" and requiring that the instrument's language precisely express "the specific intent to cause a forfeiture").

Furthermore, to the extent there is any question that—under paragraph 5(C) of the Contract —Sheriff Jenkins is liable for *medical expenses* that have not been paid by PRJA, Sheriff Jenkins' liability for Hubbard's medical services is independently supported as a *medical cost* under paragraph 5(B). Paragraph 5(B) provides that Sheriff Jenkins will pay to PRJA all medical costs pursuant to paragraph 4. *See* Contract, ¶¶ 4, 5(B). Paragraph 4 medical costs include the cost of PRJA providing emergency medical treatment to Transfers. *See* Contract, ¶ 2(B) (PRJA will provide emergency medical treatment to Transfers); Contract, ¶ 4 (PRJA will provide for or arrange all medical care for inmates). The paragraph 5(B) payment provision refers to paragraph 4 to qualify Sheriff Jenkins' contractual responsibility in these two ways:

(1) There is no *additional* charge beyond the per diem rate to Sheriff Jenkins for medical costs resulting from routine health checks and dental care, including tooth extractions; and

(2) Sheriff Jenkins is responsible for the cost of the following *with prior approval*: all non-emergency treatment, chronic care, preexisting conditions, elective medical procedure or outside psychiatric care and any care for chronic illnesses and prescription medication.

*See* Contract, ¶ 4. Importantly, paragraph 4 does not exclude emergency medical services from the scope of medical costs assigned to Sheriff Jenkins by paragraph 5(B). See Contract, ¶¶ 4, 5(B). Moreover, nothing in the Contract suggests that the meaning of the term "medical cost" is limited by any invoicing or expense-paying conditions. For this reason as well, Sheriff Jenkins' demurrer based on purported unfulfilled conditions-precedent to his obligation to pay the cost of Hubbard's emergency medical services fails. Alternatively, the demurrer cannot be sustained if the Contract is deemed materially ambiguous because emergency medical services are addressed

in *different* ways by paragraphs 5(B) and 5(C).  *See Greater Richmond Civic Recreation*, 200 Va. at 596 (reversing trial court judgment sustaining demurrer where contract was deemed materially ambiguous).

Although the invoicing procedures of the Contract, paragraph 7, appear to be mandatory, those procedures are not expressed as *conditions* that support a forfeiture due to non-compliance. *See* Contract, ¶ 7; *Hunter*, 298 Va. at 424.  Paragraph 7 provides that:

> The PRJ[A] will prepare a bill for [Sheriff Jenkins] monthly.  Such bill will set forth the number of inmates and inmates days as well as an itemization of any additional charges for the items set forth in Paragraph 4.  [Sheriff Jenkins] agrees to pay or cause to be paid such bill within forty-five (45) days of receipt.

Contract, ¶ 7.  In this provision, PRJA has promised to prepare a monthly bill for Sheriff Jenkins that includes "any additional charges" for medical costs.  Notwithstanding the possibility that PRJA may have failed to satisfy this invoicing provision, Hubbard's omission of an allegation from his Complaint that PRJA complied with paragraph 7 does not undermine his claim. Nothing in the Contract suggests that compliance with this invoicing provision is a *condition-precedent* to Sheriff Jenkins' *liability* for Hubbard's medical costs.  Although PRJA has promised that it *will* prepare monthly invoices for Sheriff Jenkins to pay, there is no express conditional language tying PRJA's failure-to-invoice to a *forfeiture* of PRJA's right to recover medical costs from Sheriff Jenkins.  *See Hunter*, 298 Va. at 424.  At most, paragraph 7 specifies when Sheriff Jenkins' payment is *due*.  *See* Contract, ¶ 7.

Moreover, as an intended third-party beneficiary of the Contract, Hubbard stands in the shoes of PRJA.  Even if Hubbard's Complaint has not already supplied an invoice to Sheriff Jenkins, Hubbard can perform the invoicing terms of paragraph 7 by presenting a bill for his emergency medical services to Sheriff Jenkins.

Finally, Hubbard's Complaint seeks *declaratory* relief, requesting an adjudication of Sheriff Jenkins' obligation to pay the medical costs associated with the emergency medical services Hubbard received. Resolving any doubts about how Sheriff Jenkins will be invoiced for amounts he may be adjudicated to owe was not before the trial court and is not before this Court on appeal.

### B.  The Tort Settlement Does Not Bar Hubbard's Claim

The tort Settlement—arising from Hubbard's lawsuit relating to the serious injuries Hubbard suffered while at PRJA—neither releases Sheriff Jenkins from his liability for Hubbard's medical expenses nor requires that the Settlement *proceeds* be used to satisfy the medical liens arising from those expenses. Besides Hubbard, the parties to the Settlement include "Piedmont Regional Jail Authority (PRJA), Superintendent James Davis, Christopher Powell, Noel Patino, Shane McAulay, [and] their agents, successors, assigns, insurers, underwriters, legal representatives, heirs, executors, and administrators" (collectively, the Defendants). *See* Settlement, p. 1. The Settlement recites that its purpose is to settle Hubbard's pending lawsuit against the Defendants. *Id*. Nothing in the Settlement or the record supports finding that Sheriff Jenkins is included in the group of Defendants. Because—on its plain terms—the Settlement only extinguishes Hubbard's claims against the Defendants, the Settlement does not extinguish any claim Hubbard may have against Sheriff Jenkins.

Although the Settlement provides that—as between Hubbard and the Defendants— Hubbard bears responsibility for costs or obligations arising from his receipt of settlement proceeds, the Settlement does not purport to absolve others from any obligation they may have to satisfy those obligations. The Settlement provides that Hubbard agrees that he is "solely responsible for any federal, state or other taxes or other legal obligations that may be owed as the result of such payment made by Defendants pursuant to the [Settlement]." Settlement, ¶ 1. Even

- 41 -

if the lien on Hubbard's Settlement payment—relating to the cost of Hubbard's emergency medical services—is an "other legal obligation that may be owed as a result of such payment," the Settlement does not require that Hubbard satisfy that obligation from the settlement proceeds. The Settlement only precludes Hubbard from shifting that obligation to the Defendants. Thus, paragraph 1 of the Settlement does not have any bearing on Hubbard's claim that Sheriff Jenkins is responsible for that obligation.

Similarly, the Settlement provisions in paragraphs 2 and 3—titled "Complete Satisfaction" (Settlement, ¶ 2) and "Release of Claims by Mr. Hubbard" (Settlement, ¶ 3)—are limited to claims that Hubbard may have against the Defendants and have no bearing on Hubbard's claim against Sheriff Jenkins. *See* Settlement, ¶¶ 2, 3. The "Release of Claims by Mr. Hubbard" is expressly limited to the "Defendants and . . . their current and former employees, members, and staff." *See* Settlement, ¶ 3. Viewed in isolation, the "Complete Satisfaction" provision of the Settlement is not expressly limited to claims against the Defendants. But the agreed "full and complete settlement of all claims of every kind and description . . . allegedly arising from the incident directly or indirectly described or identified in the Litigation" can only be construed to limit Hubbard's asserted or unasserted claims against the Defendants. Nothing in the Settlement supports a finding that either Hubbard or the Defendants intended that the Settlement satisfied any claims against Sheriff Jenkins. For the Settlement to be construed to apply to Sheriff Jenkins, both Hubbard and the Defendants would have to have had that intent and manifested that shared intent in the Settlement. *See Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 290 Va. 36, 46 (2015) (meeting of the minds required for contract formation must be expressed in the contract). Although the "Complete Satisfaction" provision encompasses a broad collection of *claims*, it does nothing to expressly broaden the collection of *persons or entities* for whom such claims are agreed satisfied.

VII. CONCLUSION

Hubbard is an intended third-party beneficiary of the Contract because the Contract—construed as a whole—expresses (1) the intent of PRJA to provide the benefits of custody and care to the class of inmates including Hubbard, and (2) the intent of Sheriff Jenkins to benefit Hubbard by paying for that custody and care. The Contract recites—in *whereas* clauses—the specific purpose to fulfill Sheriff Jenkins' duty to provide custody and care to the class of inmates including Hubbard. The Contract cannot be fully performed without conferring on Hubbard both the benefits of custody and care and the benefit of Sheriff Jenkins' payment for that custody and care. The Contract expressly imposes on Sheriff Jenkins full responsibility for the cost of Hubbard's emergency medical services. Sheriff Jenkins' characterization of the Contract as a mere "cost-sharing" agreement or "financial arrangement" between Sheriff Jenkins and PRJA—adopted and relied on by both the majority and the concurrence—is unsupported by the Contract. The concurrence's proposed distinction between (1) Sheriff Jenkins' contractual promise to pay and (2) PRJA's contractual promise to provide custody and care, fails to negate the intent of *both* promises to cooperatively provide a benefit to Hubbard. Sheriff Jenkins' contractual obligation to pay for Hubbard's emergency medical services is not conditioned on the Contract's invoicing and payment provisions. The Settlement neither releases Sheriff Jenkins nor directs that the cost of Hubbard's medical services be satisfied from Hubbard's settlement proceeds. As no ground before the trial court supports sustaining Sheriff Jenkins' demurrer to Hubbard's Complaint, I would reverse and remand for further proceedings.

For these reasons, I respectfully dissent.