Present: Hassell, C.J., Lacy, Keenan, Kinser, and Lemons, JJ., and Carrico and Russell, S.JJ.

IAN G. COLLINS, ET AL.                          OPINION BY
                                        SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 052647                        November 3, 2006

FIRST UNION NATIONAL BANK

                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Gaylord L. Finch, Jr., Judge

    This appeal presents the question whether a bank is liable to parties designated as beneficiaries of accounts set up for their benefit, using the term "For The Benefit Of ___" (FBO accounts), when the beneficiaries had not contracted with the bank and had no signatory authority over the accounts. The dispositive issues are whether the beneficiaries were "customers" of the bank as defined by the Uniform Commercial Code, Code § 8.4-104(a)(5), or whether the bank had otherwise assumed duties to protect their interests.

## Background

    In 1990, Congress enacted 8 U.S.C. § 1153(b)(5) (1988 & Supp. II 1990), known as the EB-5 Investment Visa Program, whereby foreign nationals could obtain permanent resident status in the United States for themselves and their families upon two conditions:  (1) the applicant must invest $500,000 in a new commercial enterprise located in a rural or high-unemployment location in the United States, and (2) the enterprise must create at least ten new jobs.  Each applicant

was required to furnish proof that he had at least $500,000 in cash, fully at risk, that the source was lawful, and that he had a relationship with a financial institution in this country that would hold his money on deposit while his application for a visa was being processed.

Two individuals, James F. O'Connor and James A. Geisler, concocted an elaborate scheme to defraud foreign nationals interested in obtaining such visas.[1]  In 1996, they began to market to foreign investors worldwide an "opportunity" to enter the EB-5 visa program by making an investment of only $100,000 to $150,000 instead of the $500,000 required by the federal law.

O'Connor and Geisler were partners in an umbrella organization called The InterBank Group, Inc. (InterBank), which encompassed a number of business entities that they controlled.  Through InterBank, they marketed and sold their EB-5 visa program to foreign investors worldwide under the name "Invest in America."  The investors were told that after they had contributed $100,000 to $150,000, plus a $20,000 "processing fee," InterBank would fund the rest of the required $500,000 by a loan InterBank would obtain for each

---

[1] O'Connor and Geisler were both convicted of a number of federal felonies and sentenced to imprisonment as a result of a 61-count federal indictment arising from this scheme.  U.S. v. O'Connor, 158 F. Supp. 2d 697 (E.D. Va. 2001).

2

investor from a bank in the Bahamas.  The investors were told that they would not be required to repay the loans or put up any collateral to secure them; rather, InterBank would be fully responsible for the loans.  The investors were told that the money they had contributed would be held in escrow until their EB-5 visa application had been approved by the federal government.[2]  Over the life of the "Invest in America" program, InterBank took in approximately 21 million dollars from over 200 foreign investors.

InterBank set up a system of sham loans in order to place $500,000 in each investor's account for a short period of time to demonstrate to the federal authorities that the investor had the requisite funds on deposit to qualify for an EB-5 visa.  InterBank first opened an FBO account in First Union National Bank (FUNB) for the benefit of an individual investor, and in it deposited the investor's original $100,000 to $150,000 contribution.  Within 24 hours, InterBank wired $350,000 to $400,000 to an account in the Bahamas.  The Bahamian bank then wired that sum to FUNB for deposit to the individual investor's FBO account, thus increasing that account's balance to $500,000.  InterBank then obtained a

---

[2] Each investor was given an "Escrow Agreement" wherein "Invest in America, LP" and its attorney agreed to hold the investor's money in an "attorney's trust account" until a visa was issued.  No such accounts were ever opened.

"print screen" showing a $500,000 balance in the investor's FBO account at FUNB as false proof to the federal authorities that the investor had indeed put up the amount to qualify for a visa.  As soon as the "print screen" had been obtained, InterBank, which exercised sole signatory authority over the FBO account, promptly removed the entire $500,000 and re-deposited it in a general account under InterBank's control. As the United States District Court found at O'Connor and Geisler's criminal trial, "These funds were then used, again and again, to effect similar sham loan transactions in connection with other alien investors."  U.S. v. O'Connor, 158 F. Supp. 2d 697, 707 (E.D. Va. 2001).  Needless to say, the investors' funds disappeared entirely in the process.

## Facts and Proceedings

The plaintiffs in the present case are 15 foreign nationals (the investors)[3] who lost their investments as a result of the "Invest in America" scheme.  They brought this action for damages against FUNB alleging fraud, breach of contract, negligence, and civil conspiracy.  After a bench trial, the trial court ruled against the investors on all

---

[3] Ian G. Collins, Pradip Muchala, Manish Patel, Muna Zuniera, Kiran M. Shah, Kshama Lodha, Megha Shresta, Archana Shresta, Bishnu Shresta, Doraisamy Venkataperumal, Mohammed Siddiqi, Roberto Comige Woisky Do Rio, Seyed Ali Shahrokny, Simon Oliver, and Carlo Barbieri.

counts.  We awarded the investors an appeal, limited to the breach of contract and negligence claims.  The pertinent facts will be stated in the light most favorable to FUNB, the prevailing party at trial.

The evidence showed that the investors had, together, lost $1,872,000 and that none of them had ever received a visa.  Their claims against FUNB were based primarily on the conduct of Harry Biehl, an assistant vice president of FUNB who oversaw the opening and operations of the "Invest in America" accounts, including the investors' FBO accounts. Biehl testified that he first met O'Connor and Geisler in September 1997 during a visit to InterBank's offices to explore the contemplated business relationship between FUNB and InterBank.  He understood that InterBank was dealing with foreign investors and his concern was "what assurances as a bank do we have that we're not dealing with some drug trafficking, some criminal aspects that might be overseas."

A few days later, Biehl visited InterBank again. O'Connor and Geisler showed him an escrow agreement they had prepared with FUNB's name entered on it.  He testified:  "I immediately handed it back to them and told them we would not, [on] any condition, open up escrow accounts."  They then asked him, "what it is that we could do."  In response, Biehl suggested a single account under InterBank's control which

could receive transfers and from which InterBank could disperse funds to invest for their clients in accordance with "whatever agreement they might have had." O'Connor and Geisler told him that they could not commingle the investor's funds; that "[they] had to stay separate." Biehl then suggested that they set up accounts "for them and for the benefit of . . . for their clients" in order to "identify who the individuals were that they were opening these accounts up for, for their own internal accounting records." O'Connor and Geisler agreed to this proposal and InterBank opened the accounts in the form: "Invest In America For the Benefit Of [name of investor]" or, in short form: "Invest In America, LP FBO [name]." It is undisputed that the individual investors had no direct relationship with FUNB with respect to the FBO accounts, had no communication with the bank concerning them before Interbank opened them, signed no documents relating to them, and had no signatory powers over them.

At the conclusion of the trial, the court took the case under advisement and considered briefs filed by counsel. Thereafter, the court ruled that the plaintiff investors had failed to carry their burden of proving, by a preponderance of the evidence, that they were customers of FUNB or that FUNB had entered into any agreement to assume fiduciary duties toward them. The Court also held that the plaintiffs had

6

failed to prove, by a preponderance of the evidence, that a relationship existed between the investors and the bank that would give rise to a duty of care on the part of FUNB. Thus, the court found in favor of FUNB on both the breach of contract and negligence counts and entered final judgment for the defendant.

## Analysis

We give the findings of fact made by a trial court that heard the evidence and evaluated the credibility of the witnesses at a bench trial the same weight as a jury verdict. Those factual findings will not be disturbed on appeal unless they are plainly wrong or without evidence to support them. Forbes v. Rapp, 269 Va. 374, 379-80, 611 S.E.2d 592, 595 (2005). For those issues that present mixed questions of law and fact, we give deference to the trial court's findings of fact and view the facts in the light most favorable to the prevailing party, but we review the trial court's application of the law to those facts de novo. Caplan v. Bogard, 264 Va. 219, 225, 563 S.E.2d 719, 722 (2002).

On appeal, the investors contend that FUNB owed duties to them because they were customers of the bank within the terms of the U.C.C., and that even if they were not customers, the bank nevertheless owed duties to them when establishing their

FBO accounts, and that in any event, they were third-party beneficiaries of the contract between FUNB and InterBank.

The principles of contract law that formerly regulated the relationships between a bank and its customers have been generally displaced by the Uniform Commercial Code with respect to any situation covered by particular provisions of Article 4 of the U.C.C. Schlegel v. Bank of America, 271 Va. 542, 553-55, 628 S.E.2d 362, 367-68 (2006); Halifax Corp. v. First Union National Bank, 262 Va. 91, 104, 546 S.E.2d 696, 704 (2001). That part of the U.C.C. has been adopted as Title 8.4 in the Code of Virginia. Code § 8.4-104(a)(5) defines "Customer" in this context as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank." That definition is the exclusive determinant of customer status in this context.

The investors argue that they were "customers" of FUNB because InterBank established accounts that were "funded with money that beneficially belongs to another." We rejected that theory in United Virginia Bank v. E.L.B. Tank Constr., Inc., 226 Va. 551, 555, 311 S.E.2d 773, 775 (1984). There, E.L.B. maintained an account with a bank into which Flippo deposited funds to be used to defray future debts Flippo might owe E.L.B. After disputes arose between Flippo and E.L.B., the

8

bank permitted Flippo to withdraw funds he had deposited into the account. E.L.B. successfully sued the bank and we affirmed on appeal, holding that E.L.B. was the bank's customer and Flippo was not. The source of the funds was immaterial. Id. at 555-56, 311 S.E.2d at 775-76.

The investors further argue that they were "customers" of FUNB because the bank had agreed to "collect items" for them, which brought them within the U.C.C. definition quoted above. They point out that "Item" is defined by Code § 8.4-104(a)(9) as "an instrument or a promise or order to pay money handled by a bank for collection or payment." Thus, they say, when their checks arrived at FUNB and were deposited into the FBO accounts, the bank was collecting "items" for them and it had "agreed" to do so. The fallacy in that argument is that if FUNB had an agreement to collect items, the agreement was with InterBank, not the investors, and the agreement was to collect items for InterBank, not for the investors. Indeed, under our holding in E.L.B., if the bank had recognized the investors' interest in the funds deposited to the FBO accounts and permitted the investors to withdraw them, it would have been liable in damages to its customer, InterBank. For these reasons, we conclude that the investors were not "customers" of FUNB with respect to the FBO accounts.

9

The investors contend that even if they were not customers of FUNB, they were nevertheless third-party beneficiaries of the contract between FUNB and InterBank. That contention must rest on Code § 55-22, which provides, in pertinent part:

> [I]f a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made . . . such person . . . may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise.

We have consistently held that this third-party beneficiary doctrine is subject to the limitation that the third party must show that the contracting parties clearly and definitely intended that the contract confer a benefit upon him. Caudill v. County of Dinwiddie, 259 Va. 785, 793, 529 S.E.2d 313, 317 (2000); MNC Credit Corp. v. Sickels, 255 Va. 314, 320, 497 S.E.2d 331, 334 (1998); Forbes v. Schaefer, 226 Va. 391, 401, 310 S.E.2d 457, 463 (1983).

Here, the trial court, having weighed the evidence and evaluated the credibility of the witnesses, found no such intention on the part of FUNB and InterBank, the contracting parties. The evidence of FUNB's intention in setting up the FBO accounts was provided by Biehl's testimony that his main concern was to protect the bank from any involvement with criminal activity. He refused to open escrow accounts, which

10

would have imposed upon FUNB duties to the investors as well as to InterBank, and instead suggested FBO accounts, in which InterBank, the bank's sole customer, would have sole control of the funds on deposit. There was no direct evidence of the intentions of InterBank, the other contracting party, but the circumstantial evidence of the conduct of its principals was sufficient to support the trial court in concluding that conferring a benefit upon the investors was the farthest thing from their minds.

Finally, the investors contend that the machinations of InterBank and its related entities were sufficient to put FUNB on notice that its customer, InterBank, was engaging in large-scale money laundering. In that event, FUNB would undoubtedly have incurred a duty to report the facts to the federal authorities, but there is no evidence that it failed to do so. The investors cite no authority, however, and we find none, that would have imposed upon FUNB any duties to the investors if such notice were proved.

## Conclusion

Because we find that the evidence supported the decision of the trial court, we will affirm the judgment.

<u>Affirmed.</u>