COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Chief Judge Decker, Judges Fulton and Ortiz
Argued at Richmond, Virginia


MATHEW P. APPELGET, ET AL.
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0096-23-2                      JUDGE JUNIUS P. FULTON, III
                                                         JUNE 11, 2024
PIG AND PEARL BBQ LLC


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
C.N. Jenkins, Jr., Judge

Stewart R. Pollock (Martin A. Conn; Moran Reeves & Conn PC, on
briefs), for appellants.

Justin S. Feinman (Ashley R. Phillips; Williams Mullen, on brief),
for appellee.


This case arises from a business dispute concerning the Pig and Pearl Restaurant, which

operated at 2053 W. Broad Street, Richmond, Virginia from 2013 through 2017. The appellants in

this case, Mathew Appelget, Season Appelget, and 2053 W. Broad Street, LLC ("appellants")

entered into a business relationship to create the Pig and Pearl Restaurant with the appellee in this

case, Pig and Pearl BBQ LLC, a limited liability company formed by Dr. Jonathan Sethna for the

purpose of investing in the restaurant. This venture between the parties ultimately was

unsuccessful, and Pig and Pearl BBQ LLC filed a multi-count lawsuit against appellants asserting

claims of fraudulent inducement, breach of contract, and several equitable claims. At the start of the

bench trial, the trial court granted Pig and Pearl BBQ LLC's motion for default judgment against

2053 W. Broad Street Restaurant and Bar, LLC. After hearing the evidence, the trial court

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

dismissed all the counts with the exception of two counts which alleged that appellants had breached their contractual duties and awarded Pig and Pearl BBQ LLC $100,000, the amount that it had originally contributed to the restaurant. Appellants timely noted their appeal. For the following reasons, we reverse.

BACKGROUND

The origins of this dispute began as it ended, with a business opportunity born out of the ashes of a failed restaurant venture. The focal point of this venture was the building located at 2053 W. Broad Street, in Richmond, Virginia. This property was wholly owned by 2053 W. Broad Street, LLC during the relevant time period. Mathew Appelget was the sole member of 2053 W. Broad Street, LLC. 2053 W. Broad Street, LLC was dissolved sometime after litigation between the parties began. Prior to 2013, 2053 W. Broad Street, LLC obtained possession of the building and a money judgment against a former tenant that had operated a restaurant out of the space. The prior tenant satisfied the judgment by relinquishing ownership of the restaurant equipment and inventory to 2053 W. Broad Street, LLC. Seizing this opportunity, Mathew and his wife, Season Appelget (the "Appelgets"), planned to open a new restaurant in the building. Mathew approached an acquaintance, Dr. Jonathan Sethna, who claimed to be an expert in operating restaurants. Jonathan expressed interest in investing in the new restaurant.

*I. The Formation of the Pig and Pearl Restaurant*

The Appelgets and Jonathan engaged in negotiations which ultimately led to their agreement to open a restaurant together. The Appelgets were expected to provide the space for the restaurant, the equipment, and any other necessary items related to the operation of the restaurant. In Jonathan's words, the Appelgets were to contribute "anything that was necessary so that a fully functioning restaurant was there on day one." This contribution was valued at $200,000. Jonathan, through Pig and Pearl BBQ LLC, was expected to contribute $100,000 in cash as "working capital"

for the startup of the restaurant. The Appelgets and Jonathan memorialized this agreement by creating a separate entity to operate this new venture, 2053 W. Broad Street Restaurant & Bar, LLC ("Restaurant LLC"), and this is where the dispute involved in this case begins.

The operating agreement for the Pig and Pearl Restaurant was signed by Mathew, Season, and Jonathan in September of 2013. There is no dispute that Jonathan signed the operating agreement on behalf of Pig and Pearl BBQ LLC, the minority member of Restaurant LLC. However, the parties dispute whether Mathew and Season signed the operating agreement on behalf of 2053 W. Broad Street, LLC, or whether they signed in their individual capacities, making them parties to the contract and personally liable. Nevertheless, the operating agreement specifies that the "majority member" of Restaurant LLC is "2053 W. Broad Street, LLC."

## II. The Business Operations

After the parties signed the operating agreement, the restaurant began operations, opening on November 27, 2013. From the very onset, things began to go awry. Jonathan testified that he was not provided access to the bank accounts, nor was he provided monthly bank statements. When he raised the issue, he was assured multiple times by Season not to worry, that the restaurant was profitable. Despite assurances that the restaurant was generating significant revenue, Pig and Pearl BBQ LLC never received a distribution as the minority member.

After the 2014 fiscal year when Jonathan and the Appelgets reviewed the restaurant's tax returns, it became clear that the restaurant's finances were not being managed in an efficient manner. Concerned by this, and by the Appelgets' lack of transparency, Jonathan hired a third-party bookkeeper with his own money to conduct an audit of Restaurant LLC's books and records in 2015. The Appelgets refused to provide the bookkeeper access to the records. Ultimately, Pig and Pearl BBQ LLC only gained access to any of Restaurant LLC's financial records through repeated demands after this litigation commenced. Upon further review of the restaurant's records,

Pig and Pearl BBQ LLC determined that the Appelgets had made improper distributions of Restaurant LLC's assets and had comingled the restaurant's funds with other unrelated business accounts.

Pig and Pearl BBQ LLC filed a nine-count complaint against the Appelgets, 2053 W. Broad Street, LLC, and Restaurant LLC based on the Appelgets' conduct. Several of those claims were either nonsuited by Pig and Pearl BBQ LLC or did not survive demurrer. The surviving claims that made it to trial were: (1) fraud in the inducement, (2) breach of contract for failure to provide access to the books and records of the business, (3) breach of contract for failure to make distributions, (4) breach of contract for breach of the implied covenant of good faith and fair dealing, and (5) an unjust enrichment claim.

### III. The Trial

Jonathan testified for Pig and Pearl BBQ LLC at trial. He testified as to his experience in the restaurant industry generally and how he became acquainted with the Appelgets specifically. He testified that he and the Appelgets were intent on partnering together to open a restaurant, the Pig and Pearl. And he detailed the lengthy negotiations that took place between him and the Appelgets, regarding how they would structure the business. The parties exchanged many ideas about corporate structure and investment, as well as several proposed operating agreement drafts. They discussed the possibility of being members to the restaurant themselves, as individuals. They also discussed the possibility of creating separate LLCs to hold ownership stakes in the restaurant. Ultimately, the parties signed the September 2013 operating agreement, creating Restaurant LLC. This agreement, acknowledged by the parties as controlling, was less than clear as to who or what entities were the members of Restaurant LLC. Jonathan clarified, however, that it was his understanding that the managing member of Restaurant LLC was 2053 W. Broad Street, LLC, and

the minority member was Pig and Pearl BBQ LLC. He also clarified that those were the only two members of Restaurant LLC.

Jonathan then testified to the specific "promises" that the Appelgets made to him about how they intended to run the business. Jonathan contended that these alleged "promises" functioned as the inducement upon which he relied in agreeing to the contract. The Appelgets were to provide a "fully functioning restaurant with anything that [was] needed" as 2053 W. Broad Street, LLC's capital contribution to Restaurant LLC. Further, as owner of the premises, 2053 W. Broad Street, LLC would be flexible regarding the rent charged to Restaurant LLC. Jonathan described this provision as the "squishy rent" condition. Jonathan testified that, in his experience as a restauranteur, "rent is . . . one of the most important reasons why a restaurant fails." Because of this, he and the Appelgets had agreed that the rent charged by 2053 W. Broad Street, LLC would initially be $6,000 per month—a "low" monthly base rent—and that if the restaurant was successful, then the parties could renegotiate a higher rent. The Appelgets had also agreed that the restaurant's accounting books needed to be "above reproach" and that Jonathan would always have access to them. Further, Jonathan was promised access to all of the business's bank accounts. The parties also agreed that no major business decisions, including taking on debt or approving additional loan obligations of Restaurant LLC would take place without the approval of all members.[1]

Jonathan testified that as soon as the business opened, he began noticing potential issues with the way the Appelgets were running things. Per the terms of the operating agreement, he was not provided access to the business's bank accounts, nor was he provided monthly bank statements. He also never received "quarterly reports from the managing member" of Restaurant LLC. And he was not provided access to the business's QuickBooks record system. Further, the Appelgets

---

[1] All of these terms were also included in the operating agreement contract.

opened multiple bank accounts on behalf of Restaurant LLC with different banks, without bothering to tell Jonathan. The Appelgets began borrowing and lending money on Restaurant LLC's behalf, without notifying Jonathan. Mathew transferred various amounts of monies back and forth between the accounts of Restaurant LLC and the accounts of several unrelated business entities that he himself was an owner or member of.

Jonathan also testified specifically about Season's involvement in the business. He stated that Season was "unofficially in charge" of the restaurant and that whenever he had questions, he would speak with her. Season assured Jonathan of the restaurant's profitability on multiple occasions. And in fact, the restaurant generated approximately $1.24 million in gross revenues for the fiscal year 2014. However, in early 2015 after reviewing all the financials of the business, Jonathan testified that "the[] taxes . . . show[ed] that . . . the restaurant was not making a profit" for fiscal years 2013 and 2014. This was troubling to Jonathan, given the amount of gross revenue that the business had reportedly generated, so he hired a bookkeeper with his own money to review the restaurant's finances to see if there were areas where the restaurant could improve. At first, Jonathan's bookkeeper—Russ McDowell—was denied any access to the restaurant's financial records by both Season and Mathew. It was not until Jonathan initiated litigation that he and McDowell were able to view the financial records. Upon such review, it became clear to Jonathan that the Appelgets were not managing Restaurant LLC's finances appropriately and that they were transferring funds between the restaurant and multiple other unrelated businesses quite frequently.

Pig and Pearl BBQ LLC next called Benjamin Lenhart, a certified public accountant, to testify as an expert witness. Lenhart testified that he had reviewed the financial records relating to the business. Lenhart testified that, notwithstanding the Appelgets' initial promise to contribute $200,000 worth of assets to Restaurant LLC, no such contribution was ever recorded in the restaurant's financial records. Lenhart also detailed roughly 1,700 transfers from the restaurant's

accounts made over the course of four years by the Appelgets. Lenhart testified to several

"distributions" that were made to various entities associated with and controlled by Mathew,

including: (1) $13,602 for "facility repairs and equipment"; (2) $9,000 to River City Recycling, a

business owned by Mathew; (3) $4,000 for an unknown check; and (4) various other expenses

totaling $68,000 in expenditures during the "first couple months" of the business's lifespan.

Lenhart also noted a payment of $18,665 made by Restaurant LLC in 2014 for some unknown

expense—potentially attorney fees accrued by the Appelgets for "reviewing[,] revising, and

negotiating the operating agreement." Lenhart then went on to detail the rental payments made by

Restaurant LLC to 2053 W. Broad Street, LLC. Specifically, he noted that although the operating

agreement and initial lease agreement specified a rental price of $6,000 per month, Restaurant LLC

overpaid 2053 W. Broad Street, LLC $38,000 in rent. Lenhart also noted a few other odd expenses.

Specifically, he noted expenses for $11,580, $6,000 and $1,278.11 that appeared to be duplications.

Lenhart next testified that he was provided the point-of-sale data report for the restaurant for

the fiscal year 2014. Lenhart testified that he "identified unaccounted [for]" money in the amount

of $36,706.98. Lenhart testified that he was not provided the point-of-sale reports for fiscal years

2015 or 2016. Next, Lenhart testified that, unbeknownst to Jonathan, Restaurant LLC took out a

$35,000 loan from Bofi Federal Bank. Upon review, Lenhart concluded that "over the next month,

there was $36,165 that was transferred out to either Mr. Appelget directly or to various other entities

or companies[,] and [that] $11,000 . . . came back in for a net . . . exodus of cash $25,165." Lenhart

testified that this same course of conduct was repeated in July of 2015, wherein Restaurant LLC

took out a second loan for $50,570.97, of which $45,394 was ultimately transferred to "other

accounts of Mr. Appelget or his businesses." Those businesses included River City Recycling,

Material Management & Recycling, and A & FI, Inc. Lenhart noted that the restaurant ultimately

had to pay $13,000 in interest for the loans taken out. Lenhart testified that based upon his review,

the net deficit of outgoing funds from Restaurant LLC to unrelated business accounts owned by Mathew "[got] up to $29,054.35" in July of 2015.

In Lenhart's opinion, given that the businesses were unrelated entities, it was clear that Mathew was not keeping a clear distinction between Restaurant LLC and these other businesses. Specifically, Lenhart testified that Mathew's conduct would be described as "commingling of funds" by professionals in the accounting field. However, importantly, Lenhart also acknowledged that more money was transferred *into* Restaurant LLC's accounts from the unrelated businesses than was transferred *out*.

Next, Lenhart testified as to Season's involvement in the restaurant's finances. He testified that she was "unofficially" in charge of running the restaurant, she maintained all of the books and financial records, she made decisions about the restaurant's aesthetics, and she made certain purchases on behalf of the restaurant. Season had a personal Nordstrom credit card that she purportedly used for restaurant expenses as well as personal purchases. She then had Restaurant LLC repay the line of credit drawn on the card. Lenhart testified that she claimed roughly $7,200 worth of personal expenditures that Restaurant LLC ultimately repaid.

In sum, Lenhart identified roughly $68,000 in unjustified initial expenses, $20,000 in unnecessary banking fees, $38,000 in excess rent payments made to 2053 W. Broad Street, LLC, $36,000 in missing funds from the restaurant's accounts, and $7,200 in personal expenditures that were expensed to Restaurant LLC by Season.

On cross-examination, Lenhart was questioned about the restaurant's profitability.[2] Lenhart testified that the business ran at a loss for the fiscal years of 2013 and 2014 but generated a net profit in 2015. Specifically, Lenhart testified that the financial records he reviewed showed losses of

_____

[2] This was the first time that the subject of the restaurant's profitability was directly raised in Lenhart's testimony.

- 8 -

$136,000 in 2013 and $68,000 in 2014. He testified that those records showed a profit of $47,000 in 2015. He did not testify to any profits or losses of the restaurant in 2016 or 2017.

Mathew was called as an adverse witness for Pig and Pearl BBQ LLC's case-in-chief. He clarified that he was the sole member of 2053 W. Broad Street, LLC, that 2053 W. Broad Street, LLC was the managing member of Restaurant LLC, and that Season was never a member of either of those two entities. When asked about access to the restaurant's financial records, Mathew indicated that he was "not the person . . . that would provide that type of access because" he did not do that. Mathew further testified to his ownership interests in other, unrelated companies. He confirmed that funds were transferred from these other companies to Restaurant LLC's funds in order to "front" the restaurant's payroll obligations. Then, those funds would be transferred back to those unrelated businesses.[3] When asked whether Restaurant LLC ever "front[ed] or advance[d] or transfer[red] money to any of the other entities . . . to cover losses or liabilities" that those other businesses "could not pay," Mathew answered, "No." Further, Mathew maintained that more money came into Restaurant LLC's accounts than was transferred out.

When asked if he received permission from Jonathan to "make inter-company transfers," Mathew responded that he did not need any such permission. Further, Mathew was unable to recall whether, in transferring these monies back and forth, he had ever drawn up any loan agreements between Restaurant LLC and the other companies, or whether he had documented the transfers in any way. Mathew testified that one of the companies he owned—A & FI, Inc.—fronted "a bunch of the expenses of [appellants'] initial contribution into the restaurant for the renovation [and] the hiring of [certain subcontractors and employees]." According to Mathew, A & FI, Inc. "was an entity that had the ability to pay the bills because there was no restaurant operating account, there

---

[3] Section 4.03 provides that the members may be reimbursed for reasonable and ordinary expenses incurred on behalf of Restaurant LLC.

was no restaurant contribution at that time." Further, Mathew acknowledged that A & FI, Inc. would "frequently make payments on behalf of other entities that [Mathew] owned." He further clarified that he did not need to memorialize any transactions or transfers between any of these businesses because they were "single disregarded entities" and it was "as if it came from" him.

Mathew next testified about another business that he owned—River City Recycling. Mathew acknowledged that under his direction, Restaurant LLC transferred funds to River City Recycling, "[p]robably to pay back credit card expenses that it had incurred." Again, he testified that he did not need permission from Pig and Pearl BBQ LLC or Jonathan to make such transfers. Mathew was presented with a document from River City Recycling's bankruptcy proceedings in 2017 which indicated that Restaurant LLC was a creditor of River City Recycling. Mathew was unable to answer why Restaurant LLC would have been listed as a creditor of River City Recycling, but he confirmed that any such debt or liability was not "reimbursed or paid" to Restaurant LLC.

Mathew also testified to the dissolution of the restaurant. He stated that the restaurant closed in 2017. 2053 W. Broad Street, LLC sold the real estate—of which it was the lawful owner—as well as the building improvements and the restaurant equipment and fixtures inside the building. This sale occurred sometime in 2017, after litigation in the present case was initiated. Mathew acknowledged that none of the proceeds of this sale went to Restaurant LLC, notwithstanding the fact that Restaurant LLC was the purported owner of the restaurant equipment and fixtures.

Season was also called as a witness for Pig and Pearl BBQ LLC. She noted her involvement in the restaurant's business as well. She also testified that she had a Nordstrom credit card in her name and that she used that credit card for both personal expenses and also restaurant expenses. She was unsure of whether Restaurant LLC repaid those expenses. Season also testified that she was unsure of what happened to the proceeds of the sale of the restaurant after dissolution.

After Season's testimony, Pig and Pearl BBQ LLC rested. Counsel for appellants made a motion to strike the evidence, which was denied. Thereafter, appellants put on several witnesses in their defense, including Mathew, Sonnett Malan—Season's sister and a restaurant consultant who helped to open the restaurant, Angela Langston—Mathew's assistant, Paul Venus—a construction quality specialist who performed significant renovation work for the restaurant, and Peter Thacker—a certified public accountant who testified as an expert after reviewing Restaurant LLC's financial records.

As applicable here, Mathew largely reiterated his previous testimony given during Pig and Pearl BBQ LLC's case-in-chief. He recited how the restaurant came into being in September of 2013. He testified that 2053 W. Broad Street, LLC was the managing member of Restaurant LLC, that Pig and Pearl BBQ LLC was the minority member of Restaurant LLC, and that there were no other members (including himself and Season).

Regarding 2053 W. Broad Street, LLC's status as the managing member of Restaurant LLC, Mathew testified that he was responsible,[4] pursuant to section 7 of the operating agreement, for making distributions. He testified that he did not make any distributions pursuant to that section because the restaurant was not profitable.

Regarding the transfers between Restaurant LLC and Mathew's other business entities, he testified that he transferred money into Restaurant LLC's accounts to ensure that the restaurant was able to cover all of its debts and liabilities, including things such as paying its employees on time, paying for certain necessary renovations, and other such expenses. However, Mathew testified that

---

[4] Mathew was the corporate agent and sole member of 2053 W. Broad Street, LLC, per the corporate filings with the State Corporation Commission, attached to appellants' request for judicial notice that the trial court recognize Mathew as the sole owner and member of 2053 W. Broad Street, LLC.

he transferred more money into Restaurant LLC than he subsequently transferred out, to repay those business loans. He estimated that the surplus to Restaurant LLC was "about $296,000."

Angela Langston testified next. She explained that she was Mathew's personal assistant and had worked closely with him during his involvement in many business ventures, including Restaurant LLC. She testified that she was in charge of running the restaurant's finances and maintaining the financial records for the restaurant. She testified that she was responsible for reviewing credit card statements submitted to her by the Appelgets and making decisions about what expenses the restaurant would reimburse them for. In doing so, she acknowledged that the credit card statements contained various expenses that might have been attributed to the restaurant, another unrelated business, or to the Appelgets personally. She also confirmed that Mathew authorized her to transfer funds from one of the unrelated businesses to Restaurant LLC. According to Langston, this was only done when the restaurant could not afford to pay its expenses. Her estimation was that some, but not all, of those funds were repaid by Restaurant LLC, ultimately stating that "a lot" of the funds were never repaid. As to the issue of access to the restaurant's financial records, Langston testified that Jonathan always had electronic access to those records, which were maintained on the QuickBooks database.

Paul Venus testified next that he performed "general renovation" work for the restaurant in 2013. Venus testified that River City Recycling paid him and his crew directly for the work performed. On cross examination, he clarified that at the time, he and his crew were actually employees of River City Recycling.

Lastly, Peter Thacker testified for the defense as an expert witness. He testified that he was retained by the Appelgets to review Restaurant LLC's finances and to determine "whether Mr. Appelget and his related entities put more money into Pig and Pearl than they took out, and also, . . . [whether] the expenses for the restaurant appear[ed] to be valid and legitimate restaurant

expenses." Thacker determined that "there was essentially about $193,000 . . . at the end of money that went into the restaurant that [he did] not see coming back out." Thacker noted that he reviewed all the transfers going in and out of Restaurant LLC's accounts and that those transfers totaled nearly 1,700 separate transfers. Nevertheless, Thacker testified that in reviewing all of the financial records, he did not "find any evidence [that appellants] misappropriated funds."

After the defense rested their case, the parties made their closing arguments. Pig and Pearl BBQ LLC focused primarily on its fraud in the inducement claim, arguing that appellants had misrepresented their intentions regarding how they planned to run the business. Specifically, Pig and Pearl BBQ LLC pointed to the $68,000 of its initial $100,000 contribution that the Appelgets had spent, purportedly on expenses related to their obligation to provide a fully functioning restaurant. In turning to the breach of contract claims, Pig and Pearl BBQ LLC argued that, notwithstanding the fact that the funds transferred into the restaurant were greater than the funds transferred out, appellants had still breached their contractual duties under the contract. In making this argument, Pig and Pearl BBQ LLC argued that were it not for the Appelgets' misappropriation of funds, the restaurant would have been profitable. And further, that those "misappropriations" amounted to "distributions" under the terms of the contract. Pig and Pearl BBQ LLC also addressed its breach of contract claim regarding the denial of access to the restaurant's financial records. Of note, Pig and Pearl BBQ LLC clarified that it was not seeking any sort of injunction or equitable accounting related to this claim. Instead, the only relief Pig and Pearl BBQ LLC sought was the rescission of the contract and a return of the $100,000 investment it had initially contributed. Regarding the breach of contract claim related to the distribution of profits, appellants responded that, because the evidence failed to show that the venture was profitable, no breach of contract was established pertaining to 2053 W. Broad Street, LLC's duty to distribute such profits.

- 13 -

The trial court took the case under advisement. As reflected in its final order, the trial court granted Pig and Pearl BBQ LLC's breach of contract claims for failure to make pro rata distributions of profits and failure to allow Jonathan access to Restaurant LLC's financial records, denying the remaining claims of fraud in the inducement, unjust enrichment, and breach of the implied good faith and fair dealing requirement. In coming to this conclusion, the trial court specifically found in its final order that the restaurant was profitable and that appellants had made distributions that did not conform with the operating agreement's relevant distribution provisions. In its final order, the trial court also recited that default judgment had been granted at the outset of the trial; however, the final order noted that default judgment was granted against "2053 W. Broad Street, LLC," not Restaurant LLC. As to damages for the two breach of contract counts, the trial court further granted Pig and Pearl BBQ LLC's preferred relief sought—rescission of the contract— and held all three appellants—the Appelgets and 2053 W. Broad Street, LLC—liable for returning the $100,000 investment to Pig and Pearl BBQ LLC. Appellants timely noted their appeal.

## ANALYSIS

We think it necessary first to note exactly what is at issue on appeal given: (1) the rulings of the trial court; (2) the appeal taken by appellants; (3) the arguments made by both sides on brief; and (4) the pleadings which frame the contours of this case. First, we note that, while Pig and Pearl BBQ LLC advanced several different claims at trial, ultimately the trial court denied all but the breach of contract claims regarding the duty to make distributions in alignment with the ownership interests of the parties and the duty to allow Pig and Pearl BBQ LLC access to the restaurant's financial records. The trial court specifically found that the rest of the claims advanced—fraud in the inducement, unjust enrichment, and the good faith and fair dealing claim—were not meritorious and ultimately denied them. Pig and Pearl BBQ LLC did not appeal those determinations. Therefore, we are concerned only with the propriety of the trial court's rulings regarding the breach

- 14 -

of contract claims it granted. Further, in accordance with the specific relief requested by Pig and Pearl BBQ LLC, the trial court ordered rescission of the operating agreement between the parties, and a return of Pig and Pearl BBQ LLC's original investment into the business—the $100,000. This remedy was ordered against all of the defendants at trial, collectively—2053 W. Broad Street, LLC, 2053 W. Broad Street Restaurant and Bar, LLC (i.e., Restaurant LLC), Mathew Appelget, and Season Appelget. The trial court did not specify the relation between the claims it granted and the damages it awarded. Lastly, though Pig and Pearl BBQ LLC had originally sought an equitable accounting based on the denial of access to records, that remedy was ultimately abandoned at trial; Pig and Pearl BBQ LLC asked only for rescission of the contract and for all four defendants to "reimburse" Pig and Pearl BBQ LLC for its $100,000 investment.

On appeal, appellants raise seven assignments of error. Those assignments of error can be grouped together in four distinct categories: (1) the trial court erred in granting default judgment against 2053 W. Broad Street, LLC; (2) the evidence showed that the restaurant was not profitable and that no distributions of profits were made; (3) the contractual obligations at issue applied only to 2053 W. Broad Street, LLC, as the Appelgets were not, themselves, parties to the operating agreement; and (4) the breach of contract claim pertaining to denial of access to the financial records of the restaurant was disconnected from the $100,000 monetary damages award that the trial court ordered, as there was no showing of actual harm or damages to Pig and Pearl BBQ LLC.

Further, appellants make two additional arguments on brief. First, appellants argue that rescission was not adequately pled by Pig and Pearl BBQ LLC. Second, appellants argue that a theory of piercing the corporate veil was not adequately pled by Pig and Pearl BBQ LLC. Because neither of these two remedies were properly put at issue by Pig and Pearl BBQ LLC, appellants argue that the trial court's ruling may not be affirmed based on either of those remedies or theories.

Based on the record before us, we agree with appellants regarding the failure of proof of profitability and its effect on the outcome of this case. Further, while the evidence was sufficient to support the trial court's finding regarding the breach of contract claim related to appellants' denial of access to the restaurant's financial records, the remedy granted by the trial court does not logically flow from that finding. And lastly, we agree with appellants that the record clearly demonstrates that the trial court granted default judgment against Restaurant LLC, not 2053 W. Broad Street, LLC. Therefore, we reverse the trial court's ruling as it pertains to each of the appellants and remand with instructions to enter a final order in accordance with this opinion.

*I. Default judgment was entered against Restaurant LLC, not 2053 W. Broad Street, LLC.*

We note that the final order purporting to enter default judgment against 2053 W. Broad Street, LLC was clearly a scrivener's error. During the first day of trial, counsel for Pig and Pearl BBQ LLC "move[d] for default against 2053 West Broad Street Restaurant and Grill, LLC," stating that "[i]t's a named defendant in this case that's not here today to defend itself." In response, counsel for appellants clarified that neither he nor his firm represented Restaurant LLC. Both counsel also confirmed that Restaurant LLC no longer had any representation and was being treated as a defunct organization. The trial court thereafter entered default judgment against Restaurant LLC, announcing "so ordered" on the record.

In its final order, the trial court memorialized this occurrence, stating: "On August 9, 2022, came the parties, in person and by counsel, for a bench trial in the above-styled case. This Court GRANTED the Motion for Default Judgement against Defendant 2053 W. Broad Street, LLC as it no longer exists and has no counsel representation." Clearly this order referred to the default judgment ordered by the court against "2053 West Broad Street Restaurant and Grill, LLC"—i.e., Restaurant LLC—at the beginning of trial. Thus, it mistakenly listed 2053 W. Broad Street, LLC as the defendant against whom default judgment was entered. This was an apparent oversight by the

- 16 -

trial court which amounts to a scrivener's error. Based upon the rest of our rulings in this case, we remand to the trial court with instructions to enter a revised order correcting this error. *See* Code § 8.01-428(B).

Having so clarified this point of confusion, we next turn to the analysis of appellants' purported breaches of the operating agreement.

## *II. No distributions were made, as the restaurant was not profitable.*

The trial court found that appellants breached their contractual duty to distribute the restaurant's profits on a pro rata basis. In its final order, the trial court found that the restaurant was profitable and that Mathew had made distributions of those profits only to himself and Season, through the myriad transactions noted above. That finding was clearly erroneous, given the record before us as well as the concession made at trial by Pig and Pearl BBQ LLC during closing argument. The restaurant simply was not profitable, and the record belies the contentions asserted by Pig and Pearl BBQ LLC that any such distributions were made. Because the pleadings and the final order signal that the contract's "distribution" obligations are inextricably linked to "profits," the restaurant's lack of profitability foreclosed any such distributions. Because no distributions were made, Pig and Pearl BBQ LLC's contention regarding a lack of pro rata apportionment of such distributions fails.

"We give the findings of fact made by a trial court that heard the evidence and evaluated the credibility of the witnesses at a bench trial the same weight as a jury verdict." *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006). "Those factual findings will not be disturbed on appeal unless they are plainly wrong or without evidence to support them." *Id.* (citing *Forbes v. Rapp*, 269 Va. 374, 379-80 (2005)). If

> there is conflict of testimony on a material point, or if reasonably
> fairminded men may differ as to the conclusions of fact to be drawn
> from the evidence, or if the conclusion is dependent upon the weight
> to be given the testimony, in all such cases the verdict of the [fact

finder] is final and conclusive and cannot be disturbed . . . by this [C]ourt.

*Gilliam v. Immel*, 293 Va. 18, 24 (2017) (third alteration in original) (quoting *Hall v. Hall*, 240 Va. 360, 363 (1990)). "For those issues that present mixed questions of law and fact, we give deference to the trial court's findings of fact and view the facts in light most favorable to the prevailing party, but we review the trial court's application of the law to those facts *de novo*." *Collins*, 272 Va. at 749 (citing *Caplan v. Bogard*, 264 Va. 219, 225 (2002)).

"The question whether the language of a contract is ambiguous is a question of law which we review de novo." *Robinson-Huntley v. George Wash. Carver Mut. Homes Ass'n*, 287 Va. 425, 429 (2014) (quoting *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 631 (2002)). "Contract language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *Id.* (quoting *Eure*, 263 Va. at 632). "When an agreement is plain and unambiguous on its face, the Court will not look for meaning beyond the instrument itself. However, when a contract is ambiguous, the Court will look to parol evidence in order to determine the intent of the parties." *Id.* (quoting *Eure*, 263 Va. at 632). "The plaintiff then bears the burden of proving that the parties intended the meaning that results in a breach of contract by the defendant." *Id.* (citing *Eure*, 263 Va. at 631). "Whether the plaintiff has met that burden is a question of fact, and 'we will only reverse the finding of the trial court if it is plainly wrong or without evidence to support it.'" *Id.* at 429-30 (quoting *Eure*, 263 Va. at 631).

Here, the operating agreement unambiguously provides that, as the managing member of Restaurant LLC, 2053 W. Broad Street, LLC[5] had the authority, in its sole discretion, to distribute

---

[5] The parties disagree as to who the actual parties to the contract were. Given our ultimate ruling that no breach occurred, we need not reach that issue. *See Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) ("Given the large number of issues presented here, we look for the best and *fewest* grounds on which to resolve this appeal."); *see also Butcher v. Commonwealth*,

profits to the members of Restaurant LLC.[6]  Neither party disputes this.  That section of the contract

also provides that *if* the managing member makes distributions, it must do so in accordance with the

pro rata shares of the restaurant owned by the two members.  In other words, if 2053 W. Broad

Street, LLC, in its capacity as the managing member of Restaurant LLC, decided to make a

distribution at any time, it was required, pursuant to section 7.01(a)[7] of the contract, to distribute

33% of the profits to Pig and Pearl BBQ LLC, which owned 33% of the business.  Importantly, as

noted by the language of the contract as well as Pig and Pearl BBQ LLC's own pleadings,

"distributions" under the contract are inherently tied to the concept of profitability.  This makes

sense, as it would be impossible to payout earnings without there being profits from which to

distribute funds.

To the extent that Pig and Pearl BBQ LLC resists this conclusion, it is bound by its own

pleadings, which admit the necessary link between "distributions" and "profits."  *See Bennett v.

Sage Payment Sols., Inc.*, 282 Va. 49, 60 (2011) ("[W]e adhere to the principle that a court may not

base a judgment or decree upon facts not alleged or upon a right, however meritorious, that has not

been pleaded and claimed.  Every litigant is entitled to be told in plain and explicit language the

adversary's ground of complaint." (quoting *Syed v. Zh Techs., Inc.*, 280 Va. 58, 71 (2010))).

"Pleadings are as essential as proof, and no relief should be granted that does not substantially

298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that
we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v.
White*, 293 Va. 411, 419 (2017))); *Appalachian Power Co. v. State Corp. Comm'n*, 301 Va. 257,
292 (2020) (refusing to address an additional argument given that the Court's ruling on another
issue "moot[ed]" that argument (citing *White*, 293 Va. at 419)).

[6] Section 7.01(d) states that "all distributions of cash and property shall be made at such
times and in such amounts *as determined by* the Managing Member."  (Emphasis added).

[7] Section 7.01(a) states that "[a]ll distributions of cash or other property . . . shall be made
to the Members on a pro rata basis in accordance with their respective Equity Interests on the
record date of such distribution."

accord with the case as made in the pleading." *Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp.*, 221 Va. 1139, 1141 (1981) (quoting *Bank of Giles Cnty. v. Mason*, 199 Va. 176, 180 (1957)). In its complaint, Pig and Pearl BBQ LLC alleged that: (1) "Under the Operating Agreement, [Pig and Pearl BBQ] LLC was entitled to 33% of all *distributions of profits*"; (2) "The Appelgets promised [Jonathan] that . . . they would cause 2503 W. Broad [Street,] LLC to make ongoing *distributions of Restaurant LLC's profits*"; and (3) "Defendants breached the Operating Agreement by not *distributing 33% of Restaurant LLC's profits* to [Pig and Pearl BBQ] LLC." (Emphases added). Therefore, in order to prevail on its breach of contract claim related to failure to make distributions, Pig and Pearl BBQ LLC was required to prove that the restaurant turned a profit.

The trial court found that the restaurant was profitable and that 2053 W. Broad Street, LLC, acting through its sole member, Mathew, made numerous distributions of the restaurant's funds to Mathew, his wife, and the businesses Mathew owned. However, even viewing the evidence on appeal in the light most favorable to Pig and Pearl BBQ LLC, this finding was error. On appeal, Pig and Pearl BBQ LLC points to several facts testified to in the record to support the trial court's ruling: (1) the nearly 1,700 transfers identified by both experts between Restaurant LLC and the other, unrelated business entities that Mathew was connected to; (2) the credit card charges that Season had Restaurant LLC reimburse; (3) the $68,000 in initial expenditures that Lenhart identified; (4) the $38,000 of excess rent that Lenhart identified; (5) the nearly $37,000 in missing cash that Lenhart identified from the point of sale records; (6) the lack of any distribution or payout from 2053 W. Broad Street, LLC to Restaurant LLC after the sale of the restaurant property and equipment; and (7) pre-existing legal fees totaling $18,000 that were wrongly expensed to the restaurant. Taken together, this evidence simply does not add up to support the damages awarded by the trial court.

In a breach of contract claim, the plaintiff bears the responsibility of proving damages in order to recover. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004) (citing *Brown v. Harms*, 251 Va. 301, 306 (1996)). As noted above, Pig and Pearl BBQ LLC was required to prove that the restaurant was profitable, that 2053 W. Broad Street, LLC made distributions based upon those profits, and that Pig and Pearl BBQ LLC did not receive 33% of those distributions.

First, we note that both experts testified that the business ultimately ran at a loss of $158,000 between fiscal years 2013 and 2015. Further, Pig and Pearl BBQ LLC did not produce any evidence regarding the restaurant's profitability for the fiscal years of 2016 or 2017. Pig and Pearl BBQ LLC points to the evidence noted above to argue that the restaurant *would have been profitable* save for the unscrupulous conduct of Mathew and Season. However, there are substantial issues with that evidence as will be noted below, and in sum, the evidence upon which Pig and Pearl BBQ LLC relies does not support the contention that the restaurant would have been profitable save for Mathew's operation of the business.

We note that both expert witnesses *as well as counsel for Pig and Pearl BBQ LLC* agreed that the funds transferred *into* Restaurant LLC's accounts from Mathew's unrelated businesses were *greater than* the funds transferred out of Restaurant LLC's accounts to those businesses. Specifically, during closing argument, counsel for Pig and Pearl BBQ LLC acknowledged, "[a]nd you know what, he did by the end of the day re[pay the money borrowed,] but that doesn't matter. You cannot use -- misappropriate the funds at different times for different reasons." While we agree with Pig and Pearl BBQ LLC that the evidence clearly showed that Mathew brazenly commingled the restaurant's funds with the accounts of his other, unrelated businesses, such a violation does not

in and of itself, lead to a breach of contract. Pig and Pearl BBQ LLC was required to go further and prove either: (1) the exact amount of funds that appellants misappropriated to their own gain and how that damaged Pig and Pearl BBQ LLC, or (2) if the amount was unclear, simply that Pig and Pearl BBQ LLC was harmed by such misappropriation. *Cf. Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 469-70 (2020) ("[T]he remedy of equitable rescission . . . is . . . available when the underlying breach of contract is 'substantial' or 'material.' . . . The terms 'substantial' and 'material' imply that the breach of contract underlying a rescission claim has caused some type of injury or harm to the non-breaching party." (citing *Bolling v. King Coal Theatres, Inc.*, 185 Va. 991, 996 (1947))). Instead, counsel for Pig and Pearl BBQ LLC conceded the opposite, admitting that Mathew ultimately repaid any sums that he transferred out of Restaurant LLC's accounts. Therefore, any evidence about these transfers between Restaurant LLC and Mathew's unrelated businesses is irrelevant to the question of whether Pig and Pearl BBQ LLC introduced sufficient evidence to support the trial court's finding of harm or damages.[8]

Next, the evidence relating to 2053 W. Broad Street, LLC's failure to pay out any distributions to Restaurant LLC after the sale of the property and restaurant equipment was cursory, and Pig and Pearl BBQ LLC chose not to put on any evidence regarding the amount of the proceeds or how much of the proceeds of those sales rightfully belonged to Restaurant LLC. The failure to offer any evidence relating to the quantum of damages renders this contention nugatory.

Similarly, the contention that appellants misappropriated $68,000 of Pig and Pearl BBQ LLC's initial $100,000 contribution by utilizing that money for inappropriate expenditures lacks merit. The trial court expressly rejected the claims for fraud in the inducement and unjust enrichment. Pig and Pearl BBQ LLC argued vehemently at trial that the Appelgets had promised to

---

[8] Further, section 4.01 of the operating agreement provides that loans by a member shall not be considered a capital contribution and "repayment of such loans shall not be deemed a distribution."

utilize Pig and Pearl BBQ LLC's initial contribution only for "working capital," but that they had, in fact, been lying about that promise, secretly intending the entire time to misappropriate Pig and Pearl BBQ LLC's contribution. Pig and Pearl BBQ LLC supported this claim via Lenhart's testimony relating to the $68,000 in wrongful expenditures. Ultimately, however, the trial court rejected this claim as well as the unjust enrichment claim. The trial court could have found that by spending the $68,000, appellants had unjustly utilized that money to their own ends, putting it toward their own capital contribution by refurbishing the restaurant; but it did not, implicitly finding that those initial expenditures were not improper and did not amount to any sort of misappropriation or breach of contract. This was within the trial court's role as fact finder.

The rest of the evidence Pig and Pearl BBQ LLC points to does not exceed[9] the $158,000 deficit that the restaurant accumulated. Therefore, even viewing the evidence in the light most favorable to Pig and Pearl BBQ LLC, the record affirmatively illustrates that the restaurant was not profitable. Any such breach of contract claim based upon "distributions of profits" therefore fails.

*III. Pig and Pearl BBQ LLC did not seek an appropriate remedy pertaining to its breach of contract claim relating to access to the restaurant's financial records.*

We agree that the evidence, viewed in the light most favorable to Pig and Pearl BBQ LLC, supported the trial court's finding that appellants restricted Jonathan from accessing the restaurant's financial records, in violation of the contract. However, that breach, standing alone, does not support the trial court's decision to rescind the contract and return the initial $100,000 investment to Pig and Pearl BBQ LLC.

As noted above, an essential element to proving a breach of contract claim requires that the plaintiff show harm or damages. Here, the harm to Pig and Pearl BBQ LLC was its inability to

---

[9] The record clarifies that the supposed personal credit card charges that Season expensed to the restaurant totaled at most $7,200. That, along with the excess rent ($38,000), missing point-of-sale cash ($37,000), and pre-existing legal fees ($18,000) adds up to just over $100,000. Even assuming all these misappropriations, the restaurant still would not have turned a profit.

view the restaurant's financial records. The obvious redress for this breach would be injunctive relief and an order from the trial court requiring the keepers of the financial records (here, the Appelgets) to allow the plaintiff (here, Pig and Pearl BBQ LLC) to view the records. Moreover, if Pig and Pearl BBQ LLC believed that those financial records would show some sort of misappropriation of funds—e.g., fraud, breach of contract, or unjust enrichment—then the appropriate course of action would be to file an equitable accounting claim. And in fact, Pig and Pearl BBQ LLC did just that, asserting an equitable accounting claim in its complaint and alleging under that claim that "a full and complete accounting is necessary to determine the extent of Defendants' retention, misappropriation, or diversion of profits and the amount owed to [Pig and Pearl BBQ] LLC." As the complaint makes clear, the initial review of the financial records would have been to confirm to what extent, if any, that appellants had misappropriated the restaurant's funds. However, as we noted above, Pig and Pearl BBQ LLC failed to offer sufficient evidence to support any theory related to such misappropriation (fraud in the inducement, unjust enrichment, breach of contract). Therefore, the trial court's decision to grant rescission and restitution as a remedy here did not logically flow from the Appelgets' breach relating to access to the restaurant's financial records. *See Parrish v. Callahan*, 78 Va. App. 630, 648 (2023) (holding that a "complaint [must contain] a sufficient causal link between the [plaintiff's asserted claim] and his injury" (citing *Young-Allen*, 298 Va. at 470)); *see also Young-Allen*, 298 Va. at 469 ("Remedies . . . do not exist in the abstract; rather, they flow from and are the consequence of some wrong." (alteration in original) (quoting *Devine v. Buki*, 289 Va. 184, 187 (2015))).

## CONCLUSION

The evidence did not support the trial court's findings regarding the restaurant's profitability, nor any supposed distributions thereof. Further, Pig and Pearl BBQ LLC abandoned any appropriate remedy relating to the Appelgets' refusal to provide the financial records to

Jonathan. Therefore, we reverse and remand, with instructions for the trial court to enter an order consistent with this opinion.

*Reversed and remanded.*